UNITED STATES of America, Plaintiff,

v.

Eugene BOFFA, Sr., Francis Sheeran, Louis Kalmar, Sr., Robert Boffa, Sr., Chandler Lemon, David Mishler, and Robert Rispo, Defendants.

Crim. A. No. 80–36.

United States District Court,
D. Delaware.

Dec. 12, 1980.

Joel M. Friedman, Edward J. Levitt and Ronald G. Cole, Philadelphia Strike Force, Philadelphia, Pa., Kenneth F. Noto, U. S. Dept. of Justice, Washington, D. C., and James W. Garvin, Jr., U. S. Atty., Wilmington, Del., for plaintiff.

James C. Schwartzman of Schwartzman & Hepps, Philadelphia, Pa., for defendant Eugene Boffa, Sr.

Glenn A. Zeitz of Zeitz & Zeitz, Philadelphia, Pa., for defendant Francis Sheeran.

Thomas C. Carroll of Carroll, Creamer, Carroll & Duffy, Philadelphia, Pa., for defendant Louis Kalmar, Sr.

Ronald F. Kidd of Duane, Morris & Heckscher, Philadelphia, Pa., for defendant Robert Boffa, Sr.

Thomas A. Bergstrom, Philadelphia, Pa., for defendant Chandler Lemon.

Alan M. Lieberman of Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendant David Mishler.

James F. Kipp of Trzuskowski, Kipp, Kelleher & Pearce, P. A., Wilmington, Del., for defendant Robert Rispo.

OPINION

LATCHUM, Chief Judge.

On July 14, 1980, a Grand Jury of this District returned an Eleven Count Indictment in this criminal action naming Eugene Boffa, Sr., Francis Sheeran, Louis Kalmar, Sr., Robert Boffa, Sr., Chandler Lemon, David Mishler, and Robert Rispo as defendants.[1] In Count I, all defendants are charged with conspiracy to violate the Racketeer Influenced and Corrupt Organization Act ("RICO") in violation of 18 U.S.C. § 1962(d), and in Count II, all are charged with a substantive violation of RICO, 18 U.S.C. § 1962(c); defendant Sheeran is charged in Counts III and IV with violating certain criminal provisions of the Taft-Hartley Act, 29 U.S.C. §§ 186(b)(1) and (d); and defendants Eugene Boffa, Sr., Sheeran, and Lemon are charged in Counts V through XI of mail fraud in violation of 18 U.S.C. §§ 1341 and 2.

Defendants have responded to the Indictment with a volley of 28 separate motions[2] and memoranda in support thereof. All defendants, except Lemon, have joined in the motions of all other defendants.[3] The Government responded to those motions by complying with some requests, by certifying by affidavit Government compliance with other requests, and by filing memoranda in opposition to all other motions.[4] Although they were given the opportunity to file reply briefs,[5] none of the defendants did so. The Court held oral argument on defendants' motions on November 3, 1980[6] and upon subsequently determining that evidentiary hearings would be necessary for the resolution of the issues raised in certain motions, ordered that such hearings be held.[7] Presently before the Court are all the remaining motions of the defendants relating to those unresolved issues which do not require evidentiary hearings. Because the issues raised in the motions often overlap, the Court will discuss the various issues separately, referencing all relevant motions as it discusses the issues raised by those motions.

I. THE FACTS ALLEGED

The Court will first briefly summarize the allegations contained in the Indictment. If for the purpose of disposing of any motion or portion thereof a more particularized statement of the relevant allegations is necessary, it will be provided at that time.

From on or about January 1, 1969 up to and including the date of the filing of the

1. Docket Item ("D.I.") 1.

2. D.I. 36, 37, 38, 39, 42, 43, 44, 45, 46, 47, 48, 49, 51, 53, 54, 56, 57, 58, 61, 63, 65, 66, 67, 68, 69, 71, 75, and 94.

3. D.I. 35, 52, 55, 60, 72 and 76.

4. D.I. 96, 97, 98, 99, 100, 101, 103, 105, 106 and 119.

5. D.I. 33, ¶ 3.

6. D.I. 113.

7. D.I. 109, 110 and 111.

Indictment, all defendants were employed by and associated with an association ("the Enterprise") which consisted of a group of individuals associated in fact for the purposes of making money and obtaining other financial benefits through the interstate business of labor leasing and motor vehicle leasing. The Enterprise carried out the business of labor leasing through the instrumentality of eight separate corporations [8] named in the Indictment and the business of motor vehicle leasing was carried out by a ninth corporation [9] named in the Indictment. Defendants Eugene Boffa, Sr., Kalmar, Robert Boffa, Sr., Lemon, Mishler, and Rispo were employed by and associated with the Enterprise in that each controlled and participated in the operation of one or more of the named corporations.

Because the Enterprise was in the business of leasing labor, it had dealings with a number of unions, including International Brotherhood of Teamsters ("IBT") Locals 326 and 908. In 1970, defendant Sheeran was elected president of Local 326, assuming the post at the beginning of 1971 and remaining president up to and including the date that the Indictment was returned. Sheeran was made eligible for this union post as a result of the efforts of Eugene Boffa, Sr., who, through his own and the Enterprise's control of one of the labor leasing corporations which had in effect a collective bargaining agreement between itself and Local 326, arranged to have Sheeran hired as a truck driver by the corporation and thus made a member of Local 326 and made eligible to hold union office. In his post as union president Sheeran was associated with and employed by the Enterprise in that he would enter into collective bargaining agreements on behalf of Local 326 with corporations controlled by the Enterprise, he would operate the labor leasing business of the Enterprise in the State of Delaware, he would inform Eugene Boffa, Sr., of companies, as a result of information gained by Sheeran by virtue of his union post, which Sheeran believed might be interested in leasing labor, and he would, in concert with Eugene Boffa, Sr., and Lemon, defraud Local 326 members employed by corporations controlled by the Enterprise. In return for these activities, the Enterprise rewarded Sheeran by providing him with the free use of automobiles, the purchase of an automobile at less than market price, and a portion of the profits of the labor leasing business.

Starting on or about January 1, 1969 and continuing up to and including the date that the Indictment was returned, all defendants conspired to and did in fact knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a "pattern of racketeering activity." Sixty-two separate "racketeering acts" are charged.[10] The bulk of these acts relate to transactions occurring among the corporations controlled by the Enterprise, Locals 326 and 908 and members of those Locals who were also employed by the Enterprise corporations involved, and three corporations, Crown Zellerbach Corp. and Inland Container Corp., both in Delaware, and Continental Can Co., Inc. in Ohio, who leased labor from corporations controlled by the Enterprise.

Although the Enterprise-controlled corporations, the individual defendants, the affected employees and the unions differed, a common pattern was followed in the Enterprise's dealings with Crown Zellerbach Corp., Inland Container Corp. and Continen-

**8.** The 8 labor leasing corporations are: (1) Universal Coordinators, Inc. ("UCI"), (2) Country Wide Personnel of Jersey City, New Jersey, Inc. ("CWP of Jersey City"), (3) Country Wide Personnel of Miami, Florida, Inc. ("CWP of Miami"), (4) Country Wide Personnel, Inc. ("CWP-Florida"), (5) Country Wide Personnel of Chicago, Inc. ("CWP of Chicago"), (6) Country Wide Personnel, Inc. ("CWP-Illinois"), (7) Country Wide Personnel of California, Inc. ("CWP of California"), and (8) Preferred Personnel, Inc. ("Preferred Personnel").

**9.** The motor vehicle leasing company is All Purpose Leasing ("APL").

**10.** The words "pattern of racketeering activity" and "racketeering acts" are terms employed by and defined in RICO. *See* Section II, *infra*.

tal Can Co., Inc. (the "lessee corporations"). In each case, initially a lessee corporation leased labor from Universal Coordinators, Inc. ("UCI"), a corporation controlled by the Enterprise. In each case a collective bargaining agreement was in effect between UCI and an IBT Local, and UCI's employees who were leased to the corporation were members of that Local. In each case, several defendants devised and carried out a scheme to deprive the employees, who were truck drivers, of economic benefits they enjoyed through rights guaranteed them under the National Labor Relations Act, 29 U.S.C. § 157, economic benefits they enjoyed through rights they had under the relevant collective bargaining agreement then in effect between UCI and the relevant IBT Local, and in the case of the two lessee corporations located in Delaware, the loyal, faithful and honest services of defendant Sheeran in the performance of his duties as the elected and salaried president of Local 326. The object of this scheme was, in each case, to enable the Enterprise to continue to do business with each lessee corporation through one of the corporate entities the Enterprise controlled and thus to continue receiving revenues from each lessee corporation in the form of labor leasing fees. In each case, for various reasons, UCI would terminate its contract with the relevant lessee corporation and recommend that the lessee corporation employ a second corporation controlled by the Enterprise, without revealing the common control to either the lessee corporation or the affected employees. UCI would consequently terminate the employment of the drivers it had leased to the lessee corporation and the new Enterprise controlled corporation then either would employ different drivers altogether or would employ the same drivers but at a rate of pay lower than that required by the previous collective bargaining agreement, thus assuring the Enterprise continuous business and continuous reve-

nue.[11] Defendant Sheeran participated in this scheme, using his post as president of Local 326 to assure its success, and, in return, other defendants arranged that Sheeran receive and share in the profits and other rewards mentioned earlier.

The specific racketeering acts which are charged by the Indictment consist of (1) violations of the mail fraud statute, 18 U.S.C. §§ 1341 and 2, which occurred when letters, employment termination notices and a false affidavit were placed in the mails for the purpose of carrying out the fraudulent scheme described above, (2) violations of the Taft-Hartley Act, 29 U.S.C. §§ 186(a)(4) and 186(b)(1), and 18 U.S.C. § 2, which occurred both when certain defendants delivered, and Sheeran accepted benefits, with the intent that Sheeran be influenced in respect to his actions, decisions, and duties as president of Local 326, and (3) obstruction of justice in violation of 18 U.S.C. § 1503 which occurred when Eugene Boffa, Sr., falsified corporate records subpoenaed by a Federal Grand Jury in order to cover up certain of the racketeering activities.

## II. *RICO*

Because of the centrality of RICO to this case, it is necessary at this point, as a preliminary matter, to describe briefly the purpose and structure of RICO.

RICO was enacted as Title IX of the Organized Crime Control Act of 1970. In adopting the Act Congress found that organized crime in the United States was a highly sophisticated, diversified and widespread activity which increasingly was using the power and money which it obtained from a variety of illegal and socially exploitative endeavors "to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes." Congress further found that these activities of organized crime "weaken the stability of the Nation's economic sys-

---

11. In the case of Crown Zellerbach Corp., this corporate "shell game" enabled the Enterprise to continue to employ drivers at a rate of pay lower than that required by the relevant collective bargaining agreement and in the case of Continental Can Co., Inc., the "shell game" enabled the Enterprise to employ the drivers at a lower rate below that which they had been paid under the previous relevant collective bargaining agreement.

tem, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, and undermine the general welfare of the Nation and its citizens" but that organized crime continued to grow, in part because "the . . . sanctions and remedies available to the Government are unnecessarily limited in scope and impact." For these reasons, Congress enacted the Organized Crime Control Act of 1970 "to seek the eradication of organized crime in the United States . . . by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." Statement of Findings and Purpose, Organized Crime Control Act of 1970, Pub.L. 91-452, 1 U.S. Code Cong. & Admin.News, pp. 1073 (1970).

Thus, RICO was Congress' response to the particular problems posed by the infiltration of legitimate business by organized crime. Congress was presented with evidence showing that:

Once it invades a legitimate field of endeavor, the mob quickly brings with it a full range of corrupt practices. . . . Labor unions are infiltrated, and then labor peace is sold to businesses. . . [etc.] . . . Through the violence used in its operations and its rigidly enforced code of silence, as well as exploitation of nonmembers in its schemes, the mob seeks to gain immunity from the rules of our society governing business and labor practices.

McClellan, J.L., *The Organized Crime Act (S.30) or its Critics: Which Threatens Civil Liberties?*, 46 Notre Dame Law. 55, 141 (1970). RICO was aimed to attack those problems "by providing a means of wholesale removal of organized crime from our organizations, prevention of their return, and, where possible, forfeiture of their ill-gotten gains." *Id.*

Section 1962 of RICO is the proscriptive section of the Act. Four offenses are there defined, of which only the offenses defined in subsections (c) and (d) are charged in the present Indictment. Subsection 1962(d)

simply makes it unlawful for any person to conspire to violate any of the provisions of the other subsections of § 1962. In this case, defendants are charged with both violating, and conspiring to violate, § 1962(c).

Section 1962(c) provides in relevant part: It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

The terms used in the statute are explicitly defined in 18 U.S.C. § 1961. That section defines the term "person" to include any individual or entity capable of holding a legal or beneficial interest in property. 18 U.S.C. § 1961(3). "Enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "Pattern of racketeering activity" is defined to require "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Finally "racketeering activity" is defined to mean any of a number of acts constituting state and federal crimes which are specifically enumerated in 18 U.S.C. § 1961(1). Included in that list of crimes which constitute racketeering activity are 18 U.S.C. §§ 1341 (mail fraud) and 1503 (obstruction of justice), and 29 U.S.C. § 186 (Taft-Hartley).

Section 1963, RICO's penalty provision and the only other section implicated in this action allows the imposition of a maximum fine of $25,000, a maximum prison term of 20 years or both and further provides for the forfeiture to the United States of any interest in an enterprise acquired or maintained in violation of § 1962 and any interest in or any right giving the defendant a source of influence over any enterprise

which he has "established, operated, controlled, or participated in the conduct of" in violation of § 1962.

## III. *MOTIONS TO DISMISS*

Defendant Eugene Boffa, Sr., joined by all defendants except Chandler Lemon, has moved to dismiss Counts I and II, the RICO counts, on the grounds that RICO was not meant to apply to a purely illegitimate organization, business or enterprise such as that alleged by the Indictment, that RICO is unconstitutional on its face and as applied to the facts of this action, and that the indictment is defective in numerous respects.[12] The Court will first address the issue of whether or not RICO was intended to apply to an enterprise of the type alleged in Counts I and II of the Indictment.

### A. *Enterprise*

■ With respect to the issue of whether a purely illegitimate criminal organization may be considered an "enterprise" under RICO, there exists a clear split in the Circuits. The Second Circuit, *United States v. Altese*, 542 F.2d 104 (C.A.2, 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977), the Fourth Circuit, *United States v. Whitehead*, 618 F.2d 523 (C.A.4, 1980), the Fifth Circuit, *United States v. Elliott*, 571 F.2d 880 (C.A.5), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. McLaurin*, 557 F.2d 1064 (C.A.5, 1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978); *United States v. Hawes*, 529 F.2d 472 (C.A.5, 1976), the Seventh Circuit, *United States v. Aleman*, 609 F.2d 298 (C.A.7, 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Cappetto*, 502 F.2d 1351 (C.A.7, 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975), the Ninth Circuit, *United States v. Rone*, 598 F.2d 564 (C.A.9, 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980), and the District of Columbia Circuit, *United States v. Swiderski*, 593 F.2d 1246 (C.A.D.C.1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979), as well as the Eastern District of Pennsylvania, in this Circuit, *United States v. Fineman*, 434 F.Supp. 189 (E.D.Pa.1977), have all embraced what may be safely characterized as the majority view that an organization whose sole purpose and function is the commission of criminal activities ("a purely illegitimate enterprise") may satisfy the enterprise element of a RICO offense. Recently, however, both the First Circuit, *United States v. Turkette*, 632 F.2d 896 (C.A.1, 1980), and the Eighth Circuit, *United States v. Anderson*, 626 F.2d 1358 (C.A.8, 1980), after having undertaken an exhaustive examination of the statute and the relevant legislative history, concluded that the term enterprise does not encompass purely illegitimate organizations, but "encompass[es] only an association ... which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that can be defined apart from the commission of the predicate acts constituting the 'pattern of racketeering activity.'" *United States v. Anderson, supra*, 626 F.2d at 1372. A Sixth Circuit panel opinion with one judge dissenting also adopted the latter view in *United States v. Sutton*, 605 F.2d 260 (C.A.6, 1979) but that opinion has been withdrawn pending a resolution *en banc*. The majority of commentators concur in the latter view that RICO was not intended to extend to a purely illegitimate enterprise. Schmidt, W. L., *The Racketeer Influenced and Corrupt Organizations Act: An Analysis of the Confusion in its Application and a Proposal for Reform*, 33 Vanderbilt L.Rev. 441 (1980); Bradley, C. M., *Racketeers, Congress, and the Courts: An Analysis of RICO*, 65 Iowa L.Rev. 837 (1980); Novotny, D. J., *Comment: Title IX of the Organized Crime Control Act of 1970: An Analysis of Issues Arising in its Interpretation*, 27 DePaul L.Rev. 89 (1977).

While the Third Circuit has never taken a position on this issue, it was, however, raised in that Court in *United States v. Provenzano*, 620 F.2d 985 (C.A.3, 1980). Although the Court in that case found it

---

12. D.I. 61 and 62.

unnecessary "to adopt generally either the narrow or the broad definition of 'enterprise,'" it did hold that where the enterprise alleged in an indictment is a wholly illegitimate organization whose operations were carried out with the intention of, and did in fact succeed in, subverting "legitimate unions and business," the enterprise requirement of RICO was satisfied. *United States v. Provenzano, supra*, 620 F.2d at 993. Consequently, even if this Court were to assume, contrary to the express allegations of the Indictment, that the activities of the Enterprise charged in this action were limited to purely criminal endeavors, under the holding in *Provenzano*, the Indictment would still charge a proper RICO enterprise because the purely illegitimate activities of the Enterprise charged had the principal goal and effect of subverting the two legitimate union locals and the nine legitimate labor leasing and vehicle leasing corporations mentioned in the Indictment. Thus, even assuming that the charged Enterprise in this action were illegitimate, here, as in the *Provenzano* case, the Indictment seeks to vindicate what all concede is the primary purpose of RICO—prevention of the infiltration of legitimate businesses by racketeers.

The Court, however, need not rest its decision solely upon the holding in *Provenzano* because the Enterprise described in the present Indictment is "an association ... which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that can be defined apart from the commission of the predicate acts constituting the 'pattern of racketeering activity,'" *United States v. Anderson, supra*, 626 F.2d at 1372, and thus falls squarely within the definition of enterprise adopted by the "legitimate enterprise" courts. The Indictment describes the Enterprise as "a group of individuals associated in fact for the purposes of making money and obtaining other financial benefits through the business of labor leasing and motor vehicle leasing." Hence, the Indictment alleges an association, and alleges

that it has economic goals which it pursued through the businesses of labor and vehicle leasing, both legitimate businesses which do not constitute racketeering activities. Furthermore, the Indictment alleges that the Enterprise conducted its activities through the instrumentality of a number of legitimate corporations controlled by the Enterprise and alleges a number of legitimate activities, common in the labor leasing business, that the Enterprise performed, including the seeking out and making of contracts and the actual leasing of labor. The fact that in many, if not in most cases, the Enterprise's business activity was intertwined with, and carried out by means of, racketeering acts does not make the Enterprise "purely illegitimate." Indeed, so to hold would make RICO inapplicable to the very situation which Congress was most interested in reaching—the legitimate business taken over by racketeers who begin to manage the business using corrupt practices they learned and utilized in their other purely illegitimate endeavors.

## B. *Constitutionality of RICO*

Defendants have also moved to dismiss Counts I and II of the Indictment because RICO is unconstitutional on its face and as applied. Defendants' attack is sweeping and eclectic. Defendants' motion and supporting brief [13] are "less than pellucid" in specifying the exact grounds upon which defendants rely in challenging RICO's constitutionality. However, upon scrutinizing the arguments presented and the cases cited by defendants, the Court has determined that defendants challenge RICO's constitutionality on the basis of the following contentions:

(1) RICO is impermissively vague in violation of the due process clause because it fails to give adequate warning of the behavior which it proscribes. Defendants contend that this vagueness is due to the failure of the statute to define adequately the terms "enterprise" and "pattern of racketeering activity" and to the statute's failure to define the exact nature of the relation-

---

**13.** D.I. 62.

ships between (a) the person and the enterprise, (b) the person and the pattern of racketeering, and (c) the pattern of racketeering and the enterprise.[14]

(2) RICO impinges upon protected associational activity and therefore should be declared void for vagueness and overbreadth under the First Amendment.

(3) RICO fails to require criminal intent (*mens rea*) and/or criminal knowledge (scienter) and therefore is unconstitutional.

(4) RICO violates the Eighth Amendment's prohibition against cruel and unusual punishment.

(5) RICO is so broad that it invades areas traditionally relegated to the states and therefore violates the constitutional principles of Federalism protected by the Ninth and Tenth Amendments. These contentions will be addressed *seriatim*.

1. *Due Process Vagueness*

■ First, the Court has concluded that although the terms and the relationships which defendants challenge are, in fact, broad, the statute is "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties" and is not "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). *See Lanzetta v. New Jersey*, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921).

The Third Circuit has already rejected as meritless a contention that 18 U.S.C. § 1962(c) is vague. *United States v. Herman*, 589 F.2d 1191, 1198 (C.A.3, 1978), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979). Indeed, even though the vagueness challenges to RICO have

been multitudinous, every court which has considered the question has found the statute, including the specific provisions which the defendants challenge here, not to be vague. *See United States v. Aleman*, 609 F.2d 298, 305 (C.A.7, 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) ("enterprise" broad but not vague); *United States v. Swiderski*, 593 F.2d 1246 (C.A.D.C.), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979) (§ 1962(c) not vague and, in particular, terms, "enterprise," "employed by or associated with," "directly and indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity," and "pattern of racketeering activity," not vague); *United States v. Hawes*, 529 F.2d 472, 478–79 (C.A.5, 1976); *United States v. Campanale*, 518 F.2d 352, 364 (C.A.9, 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976) (§ 1962(c) as a whole not vague and terms, "enterprise," and "person" not vague, in particular); *United States v. Cappetto*, 502 F.2d 1351 (C.A.7, 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975); *United States v. Thevis*, 474 F.Supp. 134, 139 (N.D.Ga.1979) ("employed by or associated with . . . any enterprise," "to conduct or participate, directly or indirectly, in the conduct of enterprise's affairs," "through a pattern of racketeering activity" not vague); *United States v. Field*, 432 F.Supp. 55 (S.D.N.Y.1977), *aff'd. without opinion*, 578 F.2d 1371 (C.A.2), *cert. denied*, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978); *United States v. Castellano*, 416 F.Supp. 125, 128 (E.D.N.Y.1975); *United States v. Scalzitti*, 408 F.Supp. 1014 (W.D.Pa.1975), *appeal dismissed without opinion*, 556 F.2d 569 (C.A.3, 1977) ("conduct of affairs" language of § 1962(c) not vague); *United States v. White*, 386 F.Supp. 882 (E.D.Wis.1974) ("pattern of racketeering activity" not vague); *United States v. Stofsky*, 409

---

14. Specifically, defendants contend that the following terms which state those relationships are unconstitutionally vague:
 (i) "associated with any enterprise";
 (ii) "to conduct or participate, directly or indirectly";

(iii) "in the conduct of such enterprise's affairs";
(iv) "through a pattern of racketeering activity."

F.Supp. 609, 612–14 (S.D.N.Y.1973) ("conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity" not vague).

Defendants attempt to distinguish this extensive authority on the grounds that the other courts which have considered the issue have not focused on the statute's ambiguity regarding the nature and degree of relationship required among the elements "person," "enterprise," and "racketeering activity" and because they have not adopted the "as applied" approach taken by defendants. This Court finds these contentions spurious. First, many of the opinions cited above explicitly found that the relationships challenged by defendants here are defined with constitutionally sufficient clarity. *United States v. Swiderski, supra; United States v. Thevis, supra; United States v. Scalzitti, supra; United States v. White, supra; United States v. Stofsky, supra.* Secondly, the Court finds that the offense described by the Indictment is patently within the core of the statute's prohibitions and thus independently finds the statute neither facially vague nor vague as applied.

■ Under the due process vagueness doctrine, in most cases, where a statute is not so utterly vague as to be completely devoid of meaning, but where the scope of the statute may be open to question, the nature of the inquiry that must be made to determine facial ambiguity is not significantly different from that which must be made to determine ambiguity as applied. The relevant inquiry is whether the statute is so vague that a person could not reasonably understand that the contemplated conduct, as charged in the Indictment, would be proscribed by the statute. This doctrine was explained as follows by the Supreme Court in *United States v. National Dairy Corp.,* 372 U.S. 29, 32–33, 83 S.Ct. 594, 597–598, 9 L.Ed.2d 561 (1963):

> It is true that a statute attacked as vague must initially be examined "on its face," but it does not follow that a readily discernible dividing line can always be drawn, with statutes falling neatly into

one of the two categories of "valid" or "invalid" solely on the basis of such an examination.

We do not evaluate § 3 in the abstract. "The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases .... [A] limiting construction could be given to the statute by the court responsible for its construction if an application of doubtful constitutionality were ... presented. We might add that application of this rule frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." *United States v. Raines,* 362 U.S. 17, 22, [80 S.Ct. 519, 523, 4 L.Ed.2d 524] (1960).

The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language. *E. g., Jordan v. De George,* 341 U.S. 223, 231 [71 S.Ct. 703, 707, 95 L.Ed. 886] (1951), and *United States v. Petrillo,* 332 U.S. 1, 7 [67 S.Ct. 1538, 1541, 91 L.Ed. 1877] (1947). Indeed, we have consistently sought an interpretation which supports the constitutionality of legislation. *E. g., United States v. Rumely,* 345 U.S. 41, 47 [73 S.Ct. 543, 546, 97 L.Ed. 770] (1953); *Crowell v. Benson,* 285 U.S. 22, 62 [52 S.Ct. 285, 76 L.Ed. 598] (1932); see *Screws v. United States,* 325 U.S. 91 [65 S.Ct. 1031, 89 L.Ed. 1495] (1945).

Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed. *United States v. Harriss,* 347 U.S. 612, 617 [74 S.Ct. 808, 811, 98 L.Ed. 989] (1954). In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged.

*Robinson v. United States*, 324 U.S. 282 [65 S.Ct. 666, 89 L.Ed. 944] (1945).

*Accord, Parker v. Levy*, 417 U.S. 733, 752–61, 94 S.Ct. 2547, 2559–64, 41 L.Ed.2d 439 (1974); *Aiello v. The City of Wilmington, Delaware*, 623 F.2d 845, 850 (C.A.3, 1980).[15]

Examination of the Indictment in the present action leads inexorably to the conclusion that RICO afforded defendants adequate notice that their behavior was proscribed. First, as noted earlier, the "Enterprise" charged by the Indictment falls within even the narrow definition which has been adopted by the courts. A group of individuals in fact associated for the purpose of making money in the legitimate businesses of labor leasing and motor vehicle leasing by means of a number of corporations, as charged in the Indictment, clearly falls within the definition of "enterprise" which appears in 18 U.S.C. § 1961(4).

It is also clear from the Indictment that all defendants were "employed by or associated with" the Enterprise. All defendants except Sheeran either were employees of one or more of the corporations through which the Enterprise carried out its business, controlled one or more of those corporations, or both were employees of and controlled one or more corporations. Thus, their relationship with the Enterprise unambiguously falls within the term "employed by or associated with." Sheeran had dealings with the Enterprise's corporations in his role as the president of Local 326 whose members were employees of those corporations; he made the Enterprise aware of business opportunities; he facilitated the Enterprise's schemes to defraud members of Local 326; and he received valuable consideration from the Enterprise. Consequently, Sheeran was clearly "associated with" the Enterprise.

Finally, it is clear that any reasonable person would realize that if he pursued the course of activity attributed to defendants by the Indictment that he would be conducting or participating in the conduct of the Enterprise's affairs through a pattern of racketeering activity. Each of the sixty-two separate crimes charged by the Indictment as racketeering acts are explicitly defined to be such by 18 U.S.C. § 1961(1). Secondly, it is clear beyond doubt that any person contemplating the commission of any one of those acts, under the circumstances described by the Indictment, would realize that he was "conduct[ing] or participat[ing] . . . in the conduct of . . . [the] Enterprise's affairs through" that racketeering act. Each of the racketeering acts was committed for the Enterprise's benefit and many in fact constituted routine business activities, such as contract solicitation, firing employees and communications with employees and their union representatives. Thus, it is clear that the business of the Enterprise was carried on and its financial interests were advanced "through" or by means of the charged pattern of the racketeering acts. *See United States v. Nerone*,

---

**15.** Albeit, there are some rare cases where a statute will be so vague on its face that a court will find it invalid without examining the factual context in which it is applied. Such statutes are framed in terms so vague that it would be impossible for anybody, within certain classes of individuals to whom the statute applies, to determine what behavior would enable them to steer clear of the statute's proscriptions and would thus leave the determination of where to apply the statute to the prosecutor's unfettered discretion. Such was the case in *Lanzetta v. New Jersey*, 306 U.S. 452, 59 S.Ct. 618, 83 L.Ed. 888 (1939), cited by defendants, where the statute which was struck down for unconstitutional vagueness would have allowed anyone who had been convicted of some specified offenses sometime in the past and who did not have lawful employment to be convicted for being known to be a member of a "gang," and thus could have punished a member of that class of people for forming practically any association. Such patent vagueness is clearly absent in RICO, which requires the commission of at least two of a number of specifically enumerated criminally indictable acts while participating in or exercising some degree of control over the affairs of the enterprise, and thus could not punish purely innocent association. *United States v. Swiderski, supra; United States v. Stofsky, supra; see also Rose v. Locke*, 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975); *Knutson v. Brewer*, 619 F.2d 747, 750 (C.A.8, 1980). Thus, there is no danger that a person pursuing what would seem to be purely innocent behavior could be ensnared by the statute with no warning whatsoever.

563 F.2d 836, 851 (C.A.7, 1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978); *United States v. Gibson*, 486 F.Supp. 1230, 1244 (S.D.Ohio 1980). Finally, it would also be clear to any person contemplating the commission of the charged racketeering acts that the contemplated acts would constitute a "pattern of racketeering activity" as that term is defined by RICO and that he would thus be conducting the affairs of the Enterprise through a pattern of racketeering activity. Section 1961(5) of RICO clearly provides that the commission of at least two such racketeering acts will constitute a pattern and because the Indictment charges at least two racketeering acts and each act with which it charges defendants was in some way connected to the affairs of the Enterprise, it would be clear to anyone that the activity charged by the Indictment would fall within RICO's definition of the term "pattern." *United States v. Palmeri*, 630 F.2d 192, 204 (C.A.3, 1980); *United States v. Elliott, supra*, 571 F.2d at 899; *United States v. DePalma*, 461 F.Supp. 778, 782–83 (S.D.N.Y.1978). Indeed, it is clear that the racketeering acts charged in the Indictment would constitute a pattern even under the very narrow definition of the term "pattern" which has been adopted by some courts. *United States v. White, supra*, 386 F.Supp. at 883–84; *United States v. Stofsky, supra*, 409 F.Supp. at 613–14. Those courts have required "that the racketeering acts ... [be] connected with each other by some common scheme, plan or motive so as to constitute a pattern and not simply a series of disconnected acts." 409 F.Supp. at 614.[16] All of the racketeering acts charged in the Indictment were committed in furtherance of a plan, repeated on three separate occasions, to manipulate the Enterprise's control of several labor leasing corporations and its association with labor leaders in such a way as to enable the Enterprise to do business and earn revenues continuously through one of the corpora-

tions controlled and to deprive the employees of the Enterprise controlled labor leasing corporations of their rights under the National Labor Relations Act. There is so clearly a commonality of scheme, plan and motive, that it is hard to conceive of a case that more clearly could be a "pattern."

In light of the above considerations, the Court finds that the prohibitions contained in 18 U.S.C. § 1962(c) and (d) are neither vague on their face nor vague as applied and will deny defendants' motion to dismiss Counts I and II for vagueness on that ground.

2. *First Amendment Vagueness and Overbreadth*

Defendants nevertheless contend that because RICO allegedly punishes "associations" and activities relating to association, the stricter First Amendment standard for vagueness and the First Amendment doctrine of overbreadth must be applied, and when analyzed under these standards, RICO is unconstitutionally vague and overbroad. *Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); *United States v. Robel*, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Cramp v. Board of Public Instruction*, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); *Winters v. New York*, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed.2d 840 (1948); *United States v. Baranski*, 484 F.2d 556 (C.A.7, 1973).

The First Amendment vagueness and overbreadth doctrines are closely related but differ in application. Both are spawned by the great solicitude which must be shown to the basic freedoms protected by the First Amendment, and when considered together will strike down any statute which is sufficiently vague and/or broad that it could conceivably be used to proscribe speech, association or any other behavior protected by the First Amendment or could

---

**16.** This Court does not concur with this view. This Court adopts the view, clearly expressed in *Elliott* and *DePalma* that the clear words of the statute should govern and the only interre-

latedness that is necessary between the two predicate racketeering acts is that some nexus be shown between each act and the conduct of the Enterprise's affairs.

cast a "chill" upon protected activity such that it might deter some individuals from exercising their First Amendment rights.

■■ The First Amendment vagueness doctrine, while stricter than the simple due process vagueness standard, is similar to that standard in that it cannot be invoked by a party who is within the "hard-core" prohibitions of an otherwise valid statute whose outer limits may be vague. *Aiello v. City of Wilmington*, 623 F.2d 845 (C.A.3, 1980). The Court has already found that the activity charged by the Indictment in this case is clearly within RICO's "hard-core." This activity is so clearly prohibited that even assuming the First Amendment is implicated, defendants' First Amendment vagueness challenge must also fall.

■ Under the overbreadth doctrine, however, defendants may challenge a statute even though it clearly could be applied constitutionally to them if the statute is so overbroad or its scope is so unclear that it could be applied to other activity which is protected by the First Amendment. *Aiello v. City of Wilmington, supra.* That doctrine is clearly inapplicable here because RICO does not affect any association protected by the First Amendment. RICO, unlike the statutes in any of the cases cited above does not and could not punish association or speech alone, but could only be applied if the individual who associates, also commits two of the criminal acts specifically enumerated in 18 U.S.C. § 1961(1). It is inconceivable that "pure" association protected by the First Amendment could be punished under or even be deterred by RICO.

### 3. *RICO's Alleged Failure to Require Mens Rea*

■ Defendants' third challenge to RICO, which is based upon the statute's allegedly unconstitutional failure to require criminal intent and/or criminal knowledge

must also fall. This challenge apparently is based primarily upon the holding in *Smith v. California*, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) where the Supreme Court struck down a law imposing strict liability for the possession of an obscene book in a place of business on the ground that to impose strict liability upon a bookseller in such circumstances would encourage over-extensive self-censorship and would have the effect of restricting the public's access to even constitutionally protected matter. Thus, the law was essentially struck down under the First Amendment chilling doctrine. The principle enunciated in that case is simply inapposite to RICO which requires behavior entirely outside of the ambit of the First Amendment—viz., racketeering acts—in order to obtain a conviction. As noted above, no one could possibly be deterred from pursuing protected associational behavior or be punished for doing so under RICO.

■ In any case, it is clearly within Congressional power to create a strict liability offense which dispenses with any element of "intent," *United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), and the failure to require *mens rea*, standing alone, does not violate due process. *United States v. Greenbaum*, 138 F.2d 437 (C.A.3, 1943).[17]

### 4. *Eighth Amendment Cruel and Unusual Punishment*

■ Defendants' fourth constitutional contention that RICO violates the Eighth Amendment's prohibition of cruel and unusual punishment is also without merit. Both the forfeiture provision of RICO's penalty section, 18 U.S.C. § 1963, and the section as a whole have previously withstood such challenges. *United States v. Aleman, supra*, 609 F.2d at 306; *United States v. Huber*, 603 F.2d 387, 396–97 (C.A.2, 1979), *cert. denied*, 445 U.S. 927, 100

---

17. No other circumstances which might prohibit Congress from enacting RICO as a strict liability offense have been brought to the Court's attention. Indeed, it is clear that RICO's failure to require intent would not re-

sult in the "absence of an opportunity . . . to avoid the consequences of the law" that would violate due process. *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957).

S.Ct. 1312, 63 L.Ed.2d 759 (1980); *United States v. Thevis, supra.* Indeed, it is clear that RICO's fairly traditional penalties of fine, imprisonment, and forfeiture of contraband and property used in the perpetration of the felony are not so grossly disproportionate to the crime charged as to fall afoul of the Eighth Amendment's prohibitions. *See Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).

Defendants' arguments, however, seem to indicate that they are not arguing that RICO's penalties are disproportionate so much as they are arguing that RICO offends the Eighth Amendment's prohibition against making certain activities illegal and punishing them as such at all. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); *see Ingraham v. Wright*, 430 U.S. 651, 667, 97 S.Ct. 1401, 1410, 51 L.Ed.2d 711 (1977). Defendants attempt to recast their vagueness and First Amendment arguments into Eighth Amendment arguments by contending that to punish associative behavior on the basis of a vague statute would be prohibited by the Eighth Amendment. This argument must be rejected for the reasons stated earlier.

### 5. *Federalism*

■ The Court finds the defendants' final constitutional argument, that RICO oversteps the constitutional limits imposed upon Federal power by principles of federalism contained in the Ninth and Tenth Amendments, to be wholly meritless. Because RICO reaches only activities affecting enterprises engaged in or affecting interstate commerce, it is clearly a valid exercise of Congressional power under the commerce clause. *United States v. Cappetto*, 502 F.2d 1351, 1355–57 (C.A.7, 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975). Indeed, the profound detrimental effect of the types of activities which RICO seeks to prohibit upon interstate commerce was, as noted above, well documented in Congressional findings and hearings.

### C. *The Indictment*

In the motion and lengthy supporting memorandum, defendant Eugene Boffa, Sr., has also moved to dismiss the Indictment on a plethora of grounds ranging from claims that the Indictment is "vague," "overbroad," "conclusory," and "ambiguous" to allegations that the Grand Jury was not correctly instructed on, or failed to comprehend, the law governing the charges in this case.[18] In several passages, the comprehensive memorandum is woefully unfocused and imprecise, making it difficult for the Court to discern the exact factual and legal basis for the 26 items of complaint. To this chorus of charges, defendants Lemon and Kalmar have added their own voices through the submission of six additional, albeit concise, pretrial motions.[19]

Pared to their essentials, the seven motions offer the following grounds for dismissal of the Indictment:[20] (1) The Indictment fails to allege all elements of the offenses charged with sufficient specificity and thus violates the Fifth and Sixth Amendments, and Rule 7(c), F.R.Cr.P. In this regard, the Indictment purportedly either fails to allege or inadequately defines: (a) the composition and character of the "Enterprise" around which the RICO counts revolve; (b) the nexus between each individual defendant and the Enterprise, including the extent to which each defendant actually participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity; (c) the criminal intent (*mens rea*) possessed by each defendant; and (d) the requisite jurisdictional element required by RICO, *i. e.*, that the Enterprise was engaged in, or its activities affected, interstate commerce. (2) Counts I and II of the Indictment allege multiple

---

**18.** D.I. 61 and 62.

**19.** D.I. 45, 46, 47, 48, 49 and 51.

**20.** Although the motions are styled as motions to dismiss, on some issues the defendants simply have moved to strike portions of the Indictment or to compel the Government to make an election. This opinion will indicate when the latter two forms of relief are sought.

conspiracies instead of one single conspiracy and therefore the counts violate the Multiple Conspiracy Doctrine articulated in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). (3) Counts I, II, and V–XI each contain charges of two or more distinct and separate violations of the mail fraud statute, 18 U.S.C. § 1341, and are thus prejudically duplicitous. (4) The Indictment is multiplicitous: (a) the predicate crimes underlying the RICO counts, which are independently charged in Counts III–XI of the Indictment, are lesser included offenses of the RICO charges, in violation of the constitutional prohibitions against double jeopardy and cruel and unusual punishment, and the doctrine of multiplicity; and (b) Racketeering Acts 37–43 and 51 essentially constitute a single violation of the Taft-Hartley Act, 29 U.S.C. § 186, and are multiplicitous. (5) Counts I and II, the RICO conspiracy and substantive offenses, each requires the participation of two or more persons for its commission, and under Wharton's Rule both counts cannot be maintained. (6) Racketeering Acts 1–4, 15–40, 44–47 and 54–57 are barred by the statute of limitations and must be dismissed or stricken from the Indictment. (7) Racketeering Act 53 allegedly involved only defendant Eugene Boffa, Sr., and its inclusion within Count I will impermissibly prejudice the remaining defendants. (8) The Delaware grand jury which returned the Indictment in this case failed to conduct a meaningful, independent investigation of defendants and relied upon selectively presented hearsay evidence obtained, without court order, through the investigations of two previous Grand Juries sitting in the Eastern District of Pennsylvania.[21]

The grounds presented for dismissal of the Indictment will be addressed in turn.

### 1. *Sufficiency of the Indictment*

■ An indictment must contain the essential elements of the offense charged so as to satisfy three distinct constitutional commands. First, it must be sufficiently precise to apprise the defendant of the nature and cause of the accusation, as required by the Sixth Amendment. Second, it must enable the defendant to determine to what extent he may plead a former acquittal or conviction as a bar to a future prosecution, in accordance with the Fifth Amendment. *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *see Hagner v. United States*, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932); *United States v. Addonizio*, 451 F.2d 49, 58 (C.A.3, 1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *United States v. Silverman*, 430 F.2d 106 (C.A.2), *modified*, 439 F.2d 1198 (C.A.2, 1970), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971); *United States v. Bergdoll*, 412 F.Supp. 1308, 1317 (D.Del.1976); *United States v. Shaffer*, 383 F.Supp. 339, 341 (D.Del.1974). A third, less recognized but equally important, purpose of an indictment is to shield a defendant in a federal felony case from unfounded prosecutorial charges and to require him to defend in court only those allegations returned by an independent grand jury, as provided by the Fifth Amendment. *United States v. Goldstein*, 502 F.2d 526, 528 (C.A.3, 1974). By sufficiently articulating the critical elements of the underlying offense, an indictment insures that the accused has been duly charged by the grand jury upon a proper finding of probable cause, and will be convicted only on the basis of facts found by that body. *Id.* at 529; *see United States v. Shoup*, 608 F.2d 950, 960 (C.A.3, 1979).

■ These constitutional criteria have been implemented through Rule 7(c), F.R. Cr.P., which requires an indictment to contain a "plain, concise and definite written statement of the essential facts constituting

---

**21.** Although defendants have moved to dismiss the Indictment on the basis of this alleged grand jury abuse, counsel for defendant Lemon who filed the motion stated at oral argument that he would not press for dismissal at this time, and instead requested that the Court allow discovery into matters concerning the grand jury. Accordingly, this challenge is discussed later in this opinion in the sections on discovery.

the offense charged." Whether an indictment complies with Rule 7(c) is measured by practical considerations and minor or technical flaws which do not prejudice the accused will not invalidate an otherwise sufficient indictment. *See Russell v. United States,* 369 U.S. 749, 763, 82 S.Ct. 1038, 1046, 8 L.Ed.2d 240 (1962); *United States v. Little,* 317 F.Supp. 1308, 1309–10 (D.Del. 1970). Accordingly, the Court's task is not to determine whether the Indictment could have been more artfully or exactly written, but solely to insure that the constitutional notice requirements imposed by the Fifth and Sixth Amendments have been fulfilled. *United States v. Little, supra,* 317 F.Supp. at 1310; *United States v. Bergdoll,* 412 F.Supp. 1308, 1317 (D.Del.1976).

Defendants argue that the Indictment is bereft of any substantive content and wholly fails to satisfy the requisites of Rule 7(c). Focusing primarily on Counts I and II, defendants claim that the Indictment does not specify the essential facts concerning the Enterprise, including identification of the members of the Enterprise, its structure and operations, and the factors giving rise to its formation. Similarly, defendants argue that Counts I and II fail to establish any nexus between the defendants, the purported predicate acts listed in the Indictment, and the Enterprise, thus omitting the essential criminal conduct of a RICO violation. Finally, defendants assail both the failure of Counts I and II to identify adequately the interstate commerce element of the RICO violations, and the insufficient *mens rea* allegation contained in Count II.

Defendants' objections have superficial appeal. Upon closer examination, however, the seeming logic of these arguments fades and leaves a residue of charges which are without merit.

▪ Count I of the Indictment charges that the defendants, "together with persons known and unknown to the Grand Jury, unlawfully, wilfully and knowingly did combine, conspire, confederate and agree together and with others to violate Title 18, United States Code, Section 1962(c), to wit, to knowingly conduct and participate, di-

rectly and indirectly, in the conduct of the affairs of an enterprise engaged in and the activities of which affected interstate and foreign commerce, through a pattern of racketeering activity." Count II of the Indictment charges a substantive violation of 18 U.S.C. § 1962(c) alleging that defendants, "together with persons known and unknown to the Grand Jury, being persons employed by and associated with an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully, wilfully and knowingly did conduct and participate, directly and indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Generally, an indictment which tracks the language of the statute itself is legally sufficient to satisfy Rule 7(c) if it contains "a statement of the facts and circumstances as will inform the accused of the specific offense." *Hamling v. United States, supra,* 418 U.S. at 117–18, *quoting, United States v. Hess,* 124 U.S. 483, 487, 8 S.Ct. 571, 573, 31 L.Ed. 516 (1888). The instant Indictment clearly meets this requirement.

▪ The Enterprise alleged in the Indictment is defined as "a group of individuals associated in fact for the purposes of making money and obtaining other financial benefits through the business of labor leasing and motor vehicle leasing." As described earlier in this opinion, the business of labor leasing was conducted through eight corporations listed in the Indictment, while the Enterprise's business of motor vehicle leasing was conducted by one designated corporation. All defendants, with the exception of Sheeran, were employed by and associated with the Enterprise by virtue of their participation in, or control over, the operations of these nine corporations. Defendant Sheeran was employed by or associated with the Enterprise through his position as president of Local 326 and through the several acts performed by him on behalf of the Enterprise as described earlier in this opinion. The Indictment charges that all defendants further participated in the Enterprise's affairs through a pattern of racketeering activity encompass-

ing 62 predicate acts of mail fraud, Taft-Hartley violations and obstruction of justice. These predicate acts and the requisite nexus between them and the defendants and the Enterprise are laid bare in great detail throughout the Indictment.

The pattern of racketeering activity typically was accomplished through the following means: employees of UCI would be leased as truck drivers to a corporation by one or more of the defendants, sometimes at wages below those specified in a collective bargaining agreement in force between UCI and the local union. The contract between UCI and the corporation would be indiscriminately terminated at the behest of one of the defendants, resulting in a loss of employment for the leased truck drivers. At that time, another of the labor leasing companies controlled by the Enterprise would contract with the corporation to provide the requisite labor. Disclosure of the common control of the operations of these labor leasing companies was not made either to the contracting corporations or to the employee truck drivers. The consequences of this scheme were to deprive all the employees of economic benefits they were entitled to under the National Labor Relations Act and the pertinent collective bargaining agreement, to deprive members of Local 326 of the loyal, faithful and honest services of Sheeran as president of the union, and to allow the Enterprise to continue to do business with the contracting corporation through one of the labor leasing entities operated by the defendants.

The Indictment charges that this labor leasing scheme was implemented at three separate locations and that different combinations of defendants were involved in executing the particulars, as follows:

### (a) The Crown Zellerbach Facility

In 1966, defendants Eugene Boffa, Sr., and Kalmar negotiated and signed a contract with Crown Zellerbach Corporation to lease employees of UCI as truck drivers to service Crown Zellerbach's Newark, Delaware facility. The contract could be terminated by either party on 30 days notice.

The rate of pay negotiated for the truck drivers was lower than that provided by the collective bargaining agreement in effect between UCI and Local 326, the local union representing UCI employees. In 1971, Sheeran began his tenure as president of Local 326, and in that capacity he was a member of one of the committees which negotiated the terms of the collective bargaining agreement covering UCI employees and Local 326, which was in effect during the period 1973–1979.

In late 1973, the members of Local 326 who were leased by UCI to Crown Zellerbach met with Eugene Boffa, Sr., and demanded that UCI pay them the wage rate specified in the collective bargaining agreement. Eugene Boffa, Sr., purportedly agreed to pay this wage provided that Crown Zellerbach consented to reimburse UCI for the additional cost. Within the next month, however, Eugene Boffa, Sr., advised Crown Zellerbach that he was terminating the labor leasing contract because the operation was no longer profitable for UCI, and further recommended that Crown Zellerbach lease its truck drivers from CWP of California, another labor leasing company controlled by the Enterprise and operated by some of the defendants. In January 1974, Eugene Boffa, Sr. and Sheeran notified the UCI drivers of the termination of employment. Later that month, Eugene Boffa, Sr., allegedly caused CWP of California to solicit applications for employment as truck drivers at the Crown Zellerbach plant from members of Local 326, including those members that UCI had previously leased to Crown Zellerbach. The wage rate specified for the potential employees was again different from that stipulated in the collective bargaining agreement.

### (b) The Inland Container Facility

In 1970, defendants Eugene Boffa, Sr. and Kalmar negotiated and signed a contract with the Inland Container Corporation to lease employees of UCI as truck drivers to service Inland Container's Newark, Delaware facility. Again, the contract included a 30-day termination provision. Eugene

Boffa, Sr., allegedly caused UCI to employ and lease as a truck driver to Inland Container defendant Sheeran so that Sheeran would qualify to hold a union office of Local 326. Subsequently, Sheeran in fact was elected president of Local 326 and held that position commencing in 1971 and at all times pertinent thereafter. About early November, 1971, defendants Eugene Boffa, Sr., Kalmar, and Sheeran purportedly caused Local 326 to call off an effort to organize the in-plant employees of Inland Container at the Newark facility, so that UCI's contract with Inland Container would not be jeopardized.

In August, 1976, defendants Eugene Boffa, Sr., and Sheeran purportedly agreed that after the election of officers of Local 326, scheduled for November, 1976, Eugene Boffa, Sr., would terminate the leasing contract between UCI and Inland Container Corp. and substitute a second leasing company controlled by the Enterprise for UCI. In April 1977, Eugene Boffa, Sr., and Lemon incorporated Preferred Personnel, and shortly thereafter, on June 2, 1977, Eugene Boffa, Sr., terminated the leasing contract between UCI and Inland Container Corp. and Lemon negotiated a contract between Preferred Personnel and Inland Container. In the course of these negotiations, Lemon represented that neither he nor Preferred Personnel were in any way associated with Eugene Boffa, Sr., or UCI. Both Lemon and Eugene Boffa, Sr., separately made this same representation, moreover, to an agent of the National Labor Relations Board who was investigating the circumstances surrounding the termination of the leasing contract between UCI and Inland Container.

#### (c) *The Continental Can Facility*

In 1972, defendant Kalmar signed a contract with Continental Can Company, Inc., to lease employees of UCI as truck drivers to service Continental Can's Van Wert, Ohio facility, which contract included a 30-day termination provision. Prior to July 1, 1975, Continental Can purportedly demanded better service from UCI which UCI agreed to provide if Continental Can would increase by 25% the fee it paid UCI. Continental Can refused and UCI terminated the labor leasing contract.

On or about July 1, 1975, defendant Robert Boffa, Sr., represented that CWP of Chicago was a totally separate company from UCI. Shortly thereafter, defendant Mishler caused a letter to be sent to each person leased by UCI as a truck driver to Continental Can, inviting them to attend one of two meetings for the purpose of discussing the possibility of employment with CWP of Chicago. At a meeting on July 12, 1975, defendants Rispo and Mishler met with approximately half of these employees and advised them that there was no connection between CWP of Chicago and UCI. At a second meeting on July 13, 1975, attended by about half of the UCI drivers and a business agent of Local 908, defendants Rispo and Mishler advised the employees that CWP of Chicago would receive the contract to lease drivers to Continental Can at its Van Wert facility, and that the wage CWP of Chicago would pay its employees was approximately $.80 per hour and $.01 per mile less than the rate UCI was then paying its employees. The employees in attendance stated that they would not work for that low a rate of pay.

At a subsequent meeting later that month, defendants Mishler and Rispo again offered the UCI drivers in attendance employment with CWP of Chicago, this time at a rate approximately $.50 per hour and $.0088 per mile less than the rate paid by UCI. Mishler stated he already had received 90 applications for trucker jobs and the offer was made on a take it or leave it basis. The UCI employees accepted the driver positions, and Local 908 entered into a collective bargaining agreement with CWP of Chicago. Subsequently, CWP of Chicago entered into a contract with Continental Can to lease employees to service the Van Wert facility at a rate 25% higher than that previously charged by UCI. During this time period, Robert Boffa, Mishler and Rispo formally notified the UCI drivers and Local 908 of the termination of employment.

Besides stating in great detail the foregoing operations, Counts I and II of the Indictment also allege 38 racketeering acts involving violations of the Taft-Hartley Act, 29 U.S.C. § 186, and one act involving obstruction of justice, 18 U.S.C. § 1503. The § 186 acts generally state that Eugene Boffa, Sr., joined by defendant Kalmar, in some circumstances, delivered automobiles to defendant Sheeran for free monthly use on 18 separate occasions during 1974 and 1975, and sold to Sheeran at a price below the prevailing market price a Lincoln Continental, for the purpose of influencing Sheeran with respect to his actions, decisions and duties as president of Local 326. The rental vehicles generally were transferred to Sheeran from UCI which paid the rental fees to APL, the motor vehicle leasing corporation controlled by the Enterprise. APL also provided the Lincoln Continental to Sheeran at the purported undermarket cost. The obstruction of justice count is based on Eugene Boffa, Sr.'s alleged preparation of false records reflecting APL's cash receipts which were submitted by APL to a federal grand jury in 1975, in response to a subpoena *duces tecum*. The false entries indicated that defendant Sheeran had made monthly payments to APL for the lease of the cars during 1974 and 1975, when in fact no such payments were made.

The Court finds that the Indictment alleges the essential elements of the Enterprise, the pattern of racketeering activity and the nexus between these factors and the defendants sufficient to satisfy Rule 7(c). The description of the Enterprise is not unlike those characterizations considered adequate by many other courts. *See e. g., United States v. Aleman*, 609 F.2d 298 (C.A.7, 1979) (group of individuals associated in fact to plan and commit robberies and other illegal acts); *United States v. Diecidue*, 603 F.2d 535 (C.A.5, 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980) (group of individuals associated in fact to engage in various criminal activities); *United States v. Elliott*, 571

F.2d 880 (C.A.5, 1978), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1980) (same); *United States v. Thevis*, 474 F.Supp. 134 (N.D.Ga.1979) (group of individuals associated in fact with various corporations to operate a pornography business through certain unlawful means). Further explication of the composition and character of the Enterprise might contribute to defendants' understanding of the charges, but such evidentiary detail is not required by Rule 7(c).[22] Similarly, although the Indictment at times suffers from imprecise draftsmanship, the linkage between the Enterprise, the pattern of racketeering activity and the defendants is quite clear. The explicit discussion of each defendants' participation in the acts underlying the Indictment is sufficient to permit preparation of a defense and equips defendants with enough facts to plead former jeopardy in a subsequent prosecution. *See United States v. Diecidue, supra*, 603 F.2d at 545–46. The Indictment also is sufficiently precise to insure that the grand jury properly charged the material elements of the offense and that critical parts "were not subsequently contributed by the prosecutor alone." *Id.* at 546.

■ Defendants' attacks on the sufficiency of the *mens rea* allegation in Count II, the substantive RICO count, and the interstate commerce elements in Counts I and II similarly are without merit. Count II alleges that the defendants "*unlawfully, wilfully* and *knowingly* did conduct and participate, directly and indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." (Emphasis added.) The Count also incorporates by reference the allegations of Count I, including descriptions of the 62 predicate acts, each of which specify the requisite criminal knowledge for the underlying offense. These allegations effectively refute any challenge to the sufficiency of the *mens rea* element of the Indictment. Moreover, the *mens rea* allegation of Count II could be

---

**22.** Further facts concerning the membership of the Enterprise have been provided to the defendants by the Government in a bill of particulars.

considered gratuitously favorable to the defendants. At least one Circuit has held that the RICO statute itself does not contain an express intent requirement over and above that required by the individual predicate crimes. *See United States v. Scotto*, 641 F.2d 47, 55 (C.A.2, 1980); *United States v. Boylan*, 620 F.2d 359, 361–62 (C.A.2, 1980). Consequently, no specific intent to engage in an unlawful pattern of racketeering activity prohibited by RICO necessarily need be alleged in an indictment. *United States v. Scotto, supra*, 641 F.2d at 56. Count II's allegations of wilfulness, therefore, could be characterized as more favorable to the defendants than mandated by RICO.

■ In order to satisfy the jurisdictional element of interstate commerce, a RICO indictment must sufficiently allege an enterprise "engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(c). The activity of the enterprise, and not each predicate act of racketeering, must have an effect on interstate commerce. *United States v. Altomare*, 625 F.2d 5, 7–8 (C.A.4, 1980); *United States v. Rone*, 598 F.2d 564, 573 (C.A.9, 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Nerone*, 563 F.2d 836, 852–54 (C.A.7, 1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978); *United States v. Vignola*, 464 F.Supp. 1091, 1097 (E.D.Pa.), *aff'd*, 605 F.2d 1199 (C.A.3, 1979), *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980). Counts I and II of the Indictment both generally allege that the Enterprise was engaged in interstate commerce and support these general claims with specific factual assertions.[23] For example, the nine corporations controlled by the Enterprise allegedly were involved in the business of leasing labor and motor vehicles, both intrastate and interstate. In addition, the Indictment specifically charges that UCI leased some of its employees to work as truck drivers in plants located in various states including Delaware and Ohio.[24] The employees leased by UCI as truck drivers to Crown Zellerbach, Continental Can and Inland Container, moreover, purportedly drove trucks both within their home state and interstate.[25] These allegations, if true, are sufficient to demonstrate the minimal effect on interstate commerce required by RICO. Accordingly, defendants' challenge to the sufficiency of the interstate commerce element of Counts I and II similarly is without foundation.

A common sense reading of the Indictment reveals that Counts I and II sufficiently allege the critical elements of a RICO conspiracy and substantive offense. Accordingly, defendants' motions to dismiss those counts on the basis of purported Rule 7(c) violations will be denied.

### 2. *Multiple Conspiracies*

Both in their motions and at oral argument, defendants have vigorously pressed their contention that Counts I and II of the Indictment violate the Multiple Conspiracy Doctrine of *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and must be dismissed. The defendants argue that while Count I alleges but one conspiracy to violate RICO, the facts contained therein indicate the existence of at least three separate and distinct conspiracies, involving different combinations of defendants and having as their focus the mail fraud schemes executed at the (1) Crown Zellerbach, (2) Inland Container, and (3) Continental Can facilities.[26] Defendants also challenge the propriety of Count II which substantively charges all defendants

---

**23.** The factual assertions are generally contained in Count I and incorporated by reference in Count II.

**24.** D.I. 1, Count I, ¶¶ 5(b), 7(b) and 16(b).

**25.** *Id.* at ¶¶ 5(f), 7(i) and 16(f).

**26.** Defendants argue that interspersed throughout these three primary conspiracies are other separate conspiracies involving defendants E. Boffa, Sr., Sheeran and Kalmar, and having as their focus the violations of the Taft-Hartley Act, 29 U.S.C. § 186.

with the predicate acts underlying the three alleged separate conspiracies.[27]

■ In *Kotteakos*, the indictment charged 32 defendants with one overall conspiracy to obtain F.H.A. loans through fraudulent misrepresentations. At the trial, the proof established not one, but, eight separate conspiracies with similar illegal objectives and methods of execution. At the center of the separate conspiracies was a single man named Brown who directed each individual undertaking. 328 U.S. at 753, 66 S.Ct. at 1242. None of the other defendants, however, had knowledge of, participated in, or had any interest in the success of, the other conspiracies. *Id.* at 754, 66 S.Ct. at 1242. The Supreme Court characterized the purported conspiracy as a "wheel," with Brown at the "hub" and the other defendants as the "spokes," but observed that because of the lack of connection between the spokes, the wheel lacked a rim. *Id.* at 755, 66 S.Ct. at 1243. Accordingly, defendants were not properly charged as confederates in a single overall conspiracy, and the Court held that the variance between the proof at trial, which established multiple conspiracies, and the single conspiracy alleged in the indictment was sufficiently material and prejudicial to defendants' substantial rights to require reversal.

The rationale behind the *Kotteakos* decision is singularly straightforward: a defendant has "the right not to be tried en masse for the conglomeration of distinct and separate offenses committed by others . . . ." *Id.* at 755, 66 S.Ct. at 1243. An indictment which charges multiple conspiracies in a single count creates the risk that one defendant, against whom the government's proof is quite weak, will suffer from an evidentiary "spill-over effect" or transference of guilt from another defendant. *See United States v. Elliott, supra,* 571 F.2d at 900. Additionally, if a defendant is convicted on a count charging him with separate conspiracies, it will be impossible to

determine, for double jeopardy and sentencing purposes and for the purpose of appellate review, whether the jury found the defendant guilty of one conspiracy or both. *See United States v. Starks,* 515 F.2d 112, 116 (C.A.3, 1975); *United States v. Cryan,* 490 F.Supp. 1234, 1239 (D.N.J.1980). Finally, a count charging two or more conspiracies raises questions about the grand jury proceedings giving rise to the indictment, viz., whether the grand jury intended to charge multiple conspiracies, whether it would have charged any conspiracy at all had it been aware that the offenses were distinct, and whether the grand jury may have indicted a defendant on the basis of evidence admissible only against other defendants. *United States v. Cryan, supra,* 490 F.Supp. at 1239. Accordingly, where a single count of an indictment on its face charges multiple conspiracies, considerations of fairness and prudence require that the count be dismissed.

Defendants allege that Count I reflects a classic *Kotteakos* situation, involving multiple and distinct conspiracies with parallel objectives and operations and some common participants. In particular, defendants stress that certain of the alleged co-conspirators did not even know the other participants in the purported scheme. In rebuttal, the Government argues that the conspiracy provision of RICO requires only proof of an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity. One who agrees with another to conduct those affairs through such a pattern, therefore, properly can be charged with conspiracy even though he does not know of the existence or identity of all of the conspiracy's members or what crimes predicate to a pattern some other members of the conspiracy have agreed to commit.

■ The contours of the Multiple Conspiracy Doctrine embodied in *Kotteakos* and, as applied to RICO cases, are less than clear and the Government has not shed

27. Alternatively, defendants argue that the Indictment charges multiple enterprises. This

contention is without support.

much light on the proper standard to be invoked in this case. Much of the confusion surrounding the issue has been generated by the decision of the Fifth Circuit in *United States v. Elliott, supra,* in which the court held that RICO had displaced many of the conventional legal theories applied to concerted criminal action. 571 F.2d at 200. In that case, the court conceded that the prosecution could not have charged defendants with one single conspiracy under pre-RICO conspiracy concepts because the defendants had no contact with each other, there was no direct evidence of a common objective uniting all the defendants, and the activities allegedly embraced by the conspiracy were simply too diverse to imply awareness of an overall scheme on the part of the individual defendants.[28] *Id.* at 902. The court concluded, however, that the effect of RICO was "to free the government from the strictures of the multiple conspiracy doctrine and to allow the joint trial of many persons accused of diversified crimes." *Id.* at 900. The gravamen of a RICO offense, the court noted, was:

> that each [person] agreed to participate directly and indirectly, in the affairs of the enterprise by committing two or more predicate crimes. Under the statute it is irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs.

*Id.* at 902–03. The court ruled that the RICO agreement could be demonstrated, moreover, through proof of commission of the racketeering activity itself. Thus, because the government established that each defendant, over a period of years, committed several predicate acts in furtherance of the enterprise's affairs, "the inference of an agreement [was] unmistakable." *Id.* at 903.

Through its expansive reading of the RICO conspiracy provision, the Fifth Circuit purported to create a new species of concerted action, self-styled the "enterprise conspiracy." Under this new formulation, a defendant who aligns himself with, and commits two predicate acts in furtherance of an enterprise, may be charged with a conspiracy which includes crimes committed by other unrelated co-defendants who are employed by or associated with the same enterprise, even though the defendant neither authorized nor adopted the actions of his co-defendants, and did not have a stake in the outcome of the other predicate acts, and the other acts did not logically follow from the crimes upon which the defendant agreed to embark. Thus, under the rubric of the "enterprise conspiracy" concept, the Fifth Circuit has purported to eliminate the constraints on conspiracy law imposed by the Supreme Court in *Kotteakos.*

The *Elliott* decision has been soundly criticized by commentators, *see e. g.,* Bradley, *Racketeers, Congress, and the Courts: An Analysis of RICO,* 65 Iowa L.J. 837, 877 (1980); Note, *Elliott v. United States, Conspiracy Law and the Judicial Pursuit of Organized Crime Through RICO,* 65 Va.L. Rev. 109, 113 (1979), and has been studiously avoided by courts outside the Fifth Circuit, who have preferred to apply traditional conspiracy doctrine in determining whether multiple conspiracies have been charged in a RICO case. *See United States v. Zemek,* 634 F.2d 1159, 1169 (C.A.9, 1980); *United States v. Cryan,* 490 F.Supp. 1234, 1239–44 (D.N.J.1980); *cf. United States v. Anderson,* 626 F.2d 1358, 1369 (C.A.8, 1980). This reluctance to embrace the Fifth Circuit's new form of conspiracy stems from two concerns. First, critics charge that neither the RICO statute itself nor the legislative history evince a Congressional intent to rework basic conspiracy law in the manner suggested by *Elliott.* *See*

---

**28.** The six defendants and thirty-seven unindicted co-conspirators had committed a series of diverse, unrelated crimes including murder, theft, arson and drug dealing. Although one defendant was implicated in all the crimes, none of the crimes involved the participation of all the defendants. In addition, the defendants apparently did not form any agreements with one another beyond those required to commit each predicate offense. *See* Bradley, *Racketeers, Congress, and the Courts: An Analysis of RICO,* 65 Iowa L.J. 847, 877–78 (1980).

*United States v. Anderson, supra,* 626 F.2d at 1369; Bradley, *supra,* 65 Iowa· L.J. at 878; Note, *supra,* 65 Va.L.Rev. at 114. Second, acceptance of a theory which would impute criminal liability of one individual to another because they are employed by or associated with the same enterprise, purportedly would compromise the fundamental right of the accused to have an adjudication of personal and individual guilt. *See United States v. Cryan, supra,* 490 F.Supp. at 1242; Bradley, *supra,* 65 Iowa L.J. at 878–79; Note, *supra,* Va.L.Rev. at 123–24; *cf. Kotteakos v. United States, supra; United States v. Novia Turkette,* 632 F.2d 896, 906 (C.A.1, 1980).

The conceptual difficulties in applying the *Elliott* standard have been illustrated by a recent decision rendered by the Fifth Circuit itself. In *United States v. Bright,* 630 F.2d 804, 834, (C.A.5, 1980), the indictment alleged a conspiracy to participate in the operation of the County Sheriff's Office through a pattern of racketeering activity. Charged in the indictment were the sheriff, certain local businessmen who paid bribes to the sheriff in return for certain privileges, and associates of the sheriff who collected these bribes. The jury found that six of the seven defendants brought to trial participated in a scheme involving payoffs to the sheriff from "honky-tonk" establishments (where gambling, illegal liquor sales, and prostitution can be found) in return for a pledge of non-interference. The seventh defendant, Mr. Bright, owned a Bonding Company which paid bribes to the sheriff in return for the privilege of operating as a monopoly in the county. Although defendants were all convicted of one RICO conspiracy, the Fifth Circuit, without extended discussion, held that Bright could not be convicted as a member of a conspiracy involving all seven defendants, but instead could be considered a participant only in a more limited RICO conspiracy comprised of himself and the sheriff. *Id.* at 834.[29] Presumably, the court based this decision on the fact that Bright neither knew ‑of, participated in, nor had an interest in the success

of, the other predicate acts even though he did in fact share the desire of the other defendants to participate in the affairs of the sheriff's office through a racketeering pattern.

The Court is persuaded that the Congress did not intend to alter dramatically conventional conspiracy doctrine when it formulated the RICO conspiracy provision and, consequently, a RICO conspiracy requires more than simply a shared but unrelated desire among defendants to further the affairs of an enterprise through a pattern of crimes. The Court thus holds that the conspiracy as charged in the Indictment necessarily is subject to the constraints imposed by the Multiple Conspiracy Doctrine and must have some nexus among the individual defendants which signals the existence of a truly unified agreement.

The instant Indictment on its face charges only one conspiracy and, as demonstrated earlier in this opinion, alleges the critical facts of a single agreement sufficient to bring the conspiracy allegation to trial. *See United States v. Holland,* 494 F.Supp. 918, 922 (D.Md.1980); *United States v. Bally Manufacturing Corp.,* 345 F.Supp. 410, 422 (E.D.La.1972). Count I charges a single unified agreement on the part of all defendants to engage in the activities of the Enterprise through a pattern of racketeering activity, alleges several facts which demonstrate the manner in which each defendant was associated with the Enterprise, and further alleges several overt racketeering acts committed in furtherance of the conspiracy, all of which on their face support an inference of a single agreement. Moreover, the individual predicate acts involving the three labor leasing operations as alleged in the Indictment follow "an easily recognizable pattern," *see United States v. Morris,* 532 F.2d 436, 442 (C.A.5, 1976), and share several common denominators, including the ubiquitous presence of UCI, and common participants, indicating that there may be a single master conspiracy which embraces several

---

**29.** The court refused to overturn Bright's conviction, however, on the grounds that the variance between the indictment and the proof did not affect his substantial rights.

smaller subsidiary schemes. *See United States v. Adamo*, 534 F.2d 31, 37 (C.A.3), *cert. denied*, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976); *United States v. Kenny*, 462 F.2d 1205, 1216 (C.A.3), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972); *United States v. Hubbard*, 474 F.Supp. 64, 72 (D.D.C.1979). At trial, the Government will have to show beyond a reasonable doubt that there was such a unified agreement, shared by all defendants, to participate in the affairs of the Enterprise "through a pattern of racketeering activity." If the evidence offered at trial presents a variance in proof demonstrating multiple conspiracies, which affects the substantial rights of the defendants, they will be entitled to acquittal on Count I.[30]

### 3. *Duplicity*

■ Defendants argue that Counts I, II, and V–XI are duplicitous and seek an order either dismissing the Counts or alternatively requiring the Government to elect which of the offenses alleged in each count it will pursue at trial. In support of this motion, defendants claim that each count charges both a substantive offense under 18 U.S.C. § 1341, the mail fraud statute, and an *attempt* to commit the substantive offense. According to the Indictment, the defendants "willfully and knowingly devised *and* intended to devise a scheme and artifice to defraud the employees of UCI" who were leased as truck drivers to the three leasing corporations,[31] and "for the purpose of executing the scheme *and* attempting so to do, did place and cause to be placed in post offices" employment termination notices and other correspondence relating to the terminations.[32] Under the mail fraud stat-

ute, actually "devising a scheme or artifice to defraud" and "intending to devise" such a scheme are phrased in the disjunctive. Accordingly, defendants maintain that either act alleged in the Indictment constitutes a violation of the statute and the joining of these two separate and distinct offenses in Counts I, II and V–XI is prejudicially duplicitous.[33] *See United States v. Starks*, 515 F.2d 112, 116 (C.A.3, 1975).

■ The mail fraud statute does not define multiple crimes, but merely charges a single offense which may be accomplished by a variety of means. *United States v. Bloom*, 78 F.R.D. 591, 603 (E.D.Pa.1977). Consequently, a mail fraud indictment framed in the conjunctive and charging multiple means toward commission of an offense is not rendered duplicitous by the fact that the means are denounced disjunctively in the statute. *E. g., United States v. Niederburger*, 580 F.2d 63, 68 (C.A.3), *cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978); *United States v. Gunter*, 546 F.2d 861, 868–69 (C.A.10, 1976), *cert. denied*, 431 U.S. 920, 97 S.Ct. 2189, 53 L.Ed.2d 232 (1977); *United States v. UCO Oil Co.*, 546 F.2d 833, 838 (C.A.9, 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977); *Gerberding v. United States*, 471 F.2d 55, 59 (C.A.8, 1973); *United States v. Bloom, supra*, 78 F.R.D. at 604; *United States v. Addonizio*, 313 F.Supp. 486, 499 (D.N.J.1970), *aff'd*, 451 F.2d 49 (C.A.3), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). Although conclusive proof of any one of the different modes of commission alleged in the Indictment will support a conviction, a jury verdict will bar any further prosecution of the crime. *See United States v. UCO Oil Co., supra*, 546

---

**30.** The Government argues that the Multiple Conspiracy Doctrine has no application to Count II because Count II does not allege a conspiracy. Count II incorporates by reference, however, all the predicate acts listed in Count I. If in fact Count I alleges multiple conspiracies, the joinder of all the defendants in Count II could be prejudicial and relief under Rule 8(b) could be necessary.

**31.** D.I. 1, Count I, ¶¶ 5(m), 6(*o*) and 16(m); Count II, ¶ 7; Counts V–XI, ¶ 2.

**32.** D.I. 1, Count I, ¶¶ 5(p), 6(r) and 17(p); Count II, ¶ 7; Counts V–XI, ¶ 5.

**33.** Duplicity should be distinguished from multiplicity. Duplicity is the joining in a single count of two or more distinct and separate offenses. Multiplicity is the charging of a single offense in multiple counts. *United States v. Starks, supra*, 515 F.2d at 116, n.5.

F.2d at 838; *Gerberding v. United States, supra,* 471 F.2d at 59; *Turf Center, Inc. v. United States,* 325 F.2d 793, 796–97 (C.A.9, 1963). Thus, none of the means embraced within the Counts may surface in a future indictment and the major vice of duplicitous counts—the inability of a defendant to protect himself against double jeopardy—will be avoided. Counts I, II and V–XI are not duplicitous.

### 4. *Multiplicity*

#### (a) *Counts III–XI*

Defendants contend that because Counts III–XI also constitute the predicate offenses included in the RICO counts, the Indictment is multiplicitous, in violation of the Double Jeopardy Clause, and the Eighth Amendment ban against cruel and unusual punishment, and must be dismissed. Alternatively, defendants insist that the Government should be compelled to elect which counts it will prosecute at trial.[34]

 Offenses are multiplicitous only when the evidence required to sustain a conviction on one offense will be sufficient to warrant a conviction on the other. *United States v. Kramer,* 289 F.2d 909, 913 (C.A.2, 1961); *United States v. DePalma,* 461 F.Supp. 778, 786 (S.D.N.Y.1978). Where each offense "requires proof of a fact which the other does not," the two offenses are not the same and the prohibition against Double Jeopardy is not implicated. *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

 Although the RICO counts and Counts III–XI are obviously related, each count requires different proof. *See United States v. Aleman,* 609 F.2d 298, 306 (C.A.7, 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). While Count I incorporates as predicate acts the mail fraud and Taft-Hartley offenses contained in Counts III–XI, proof of the actual commission of, or attempt to commit, these offenses is not necessary for a conviction of

conspiracy. *See United States v. DeVincent,* 632 F.2d 155 (C.A.1, 1980). All that the Government need prove is an *agreement* by the defendants to participate in the affairs of an enterprise through a pattern of racketeering activity. Conversely, a conviction on Counts III–XI does not require concerted action on the part of defendants but does require either an attempt to commit, or actual commission of, the substantive offense. *Id.*

The interface between Count II and Counts III–XI presents a stronger case for multiplicity. Although there is some overlap in the proof needed to establish these crimes, *id.,* the RICO count requires, however, as an additional and distinct element of proof, that a pattern of racketeering activity existed through which the affairs of an enterprise were conducted. *See United States v. Rone,* 598 F.2d 564, 571 (C.A.9, 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. DePalma, supra,* 461 F.Supp. at 786; *United States v. White,* 386 F.Supp. 882, 884 (E.D.Wis.1974). Accordingly, the RICO counts and Counts III–XI cannot be characterized as multiplicitous.

Furthermore, neither the RICO statute itself nor the legislative history suggest that Congress intended to preclude separate convictions for a RICO offense and the underlying predicate crimes. *United States v. Rone, supra,* 598 F.2d at 571; *United States v. DePalma, supra,* 461 F.Supp. at 786. At issue in the separate counts of the Indictment are three different statutory schemes, each of which proscribes varying conduct and implements different Congressional purposes. *United States v. Boylan,* 620 F.2d 359, 361 (C.A.2, 1980). The criminal Taft-Hartley provisions prohibit the tendering to, or receipt by, union officials of illegal payments, and reflects Congressional concern with the integrity of labor organizations. *Id.* The purpose of the mail fraud statute is to prevent the post office department from being used to carry out

---

**34.** Since Counts III–XI only charge certain of the defendants, namely, Eugene Boffa, Sr., Sheeran and Lemon, the other defendants clearly do not have standing to claim multiplicity of the Indictment.

fraudulent schemes. *See United States v. Mandel*, 591 F.2d 1347, 1358 (C.A.4), *on rehearing*, 602 F.2d 653 (C.A.4, 1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). In contrast, the RICO statute proscribes a pattern of illegal activities and implements Congressional efforts to curb the influence of organized crime. *United States v. Boylan, supra*, 620 F.2d at 361. RICO thus was not designed to supersede any existing law, *United States v. Aleman, supra*, 609 F.2d at 306, but instead was devised as an additional weapon to prevent racketeering activity. *United States v. Rone, supra*, 598 F.2d at 571.

Accordingly, Counts I, II and III–XI are not multiplicitous and defendants' motion to dismiss the Indictment or alternatively to compel the Government to elect between Counts I and II, and Counts III–XI will be denied.

(b) *Racketeering Acts 37–43, and 51*

■ Defendant Kalmar, joined by all the defendants except Lemon, has moved for an order compelling the Government to elect among Racketeering Acts 37–43 and 51.[35] Defendants charge that these acts allege a single course of conduct and consequently constitute a single violation. The Government purportedly has arbitrarily subdivided this single offense into multiple violations in an effort to create a pattern of racketeering activity. If the Court concurs in this view, defendant Kalmar apparently would be charged with having committed only one predicate act and the logical consequence would be for him to seek dismissal of the RICO counts.

Racketeering Acts 37–43 assert that Eugene Boffa, Sr. and Kalmar caused UCI to deliver an automobile to Sheeran for free monthly use on seven separate occasions from March through October, 1975. Racketeering Act 51 charges Boffa and Kalmar with causing APL to sell a Lincoln Continental to Sheeran at a price below the prevailing market price in September, 1976. All the predicate acts were allegedly committed for the purpose of influencing Sheeran with respect to his actions, decisions and duties as president of Local 326, in violation of 29 U.S.C. § 186.

In *United States v. Alaimo*, 297 F.2d 604 (C.A.3, 1961), *cert. denied*, 369 U.S. 817, 82 S.Ct. 829, 7 L.Ed.2d 784 (1962), the Third Circuit ruled that an employee representative who received by-monthly checks from a coal company over a period spanning 17 months could properly be charged with 34 counts of Taft-Hartley violations and that the government should not be compelled to elect which count it would prosecute. In rejecting defendant's assertion that he had committed only one violation, the court concluded that a continuous course of conduct was not involved, that each time the defendant received a check from the company he violated the Act, and that it was "reasonable that Congress should have provided for a separate punishment each time an employee representative places a price upon two weeks of labor peace." *Id.* at 606; *see also United States v. Stubin*, 446 F.2d 457 (C.A.3, 1971); *United States v. Donovan*, 339 F.2d 404 (C.A.7, 1964), *cert. denied*, 380 U.S. 975, 85 S.Ct. 1338, 14 L.Ed.2d 271 (1965).

Based on the foregoing decision, by which this Court is necessarily bound, the Court concludes that Racketeering Acts 37–43, and 51 do not constitute a single violation and are not multiplicitous.[36]

5. *Wharton's Rule*

■ As a further ground for their general assault on Counts I and II, defendants contend that Wharton's Rule precludes the maintenance of both counts and the Government must elect which count it will prosecute. In essence, Wharton's Rule provides that a substantive crime which in itself requires the participation of two or

---

**35.** D.I. 51.

**36.** In any event, the Court could not conclude that Racketeering Acts 37–43 are part of a continuous course of conduct which includes Racketeering Act 51. These two classes of illegal payments were separated by a time span of one year and represented totally different forms of consideration.

more people for its commission cannot also be the subject of a separate conspiracy count.[37] *Iannelli v. United States*, 420 U.S. 770, 773, 95 S.Ct. 1284, 1287, 43 L.Ed.2d 616 (1975); *United States v. Rone*, 598 F.2d 564, 569 (C.A.9, 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980).

The scope of Wharton's Rule was discussed by the Supreme Court in *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975):

> Wharton's Rule applies only to offenses that *require* concerted criminal activity, a plurality of criminal agents. In such cases, a closer relationship exists between the conspiracy and the substantive offense because *both* require collective criminal activity. The substantive offense therefore presents some of the same threats that the law of conspiracy normally is thought to guard against, and it cannot automatically be assumed that the Legislature intended the conspiracy and the substantive offense to remain as discrete crimes upon consummation of the latter. Thus, absent legislative intent to the contrary, the Rule supports a presumption that the two merge when the substantive offense is proved.

*Id.* at 785–86, 95 S.Ct. at 1293–94.

Wharton's Rule thus stands as a limited exception to the well established principle that a conspiracy to commit a substantive offense and the substantive offense itself can be maintained as separate counts. *United States v. Ohlson*, 552 F.2d 1347, 1349 (C.A.9, 1977). Moreover, the rule is a judicial creation, designed as "an aid to the determination of legislative intent" when that intent cannot be readily discerned. *Iannelli v. United States, supra*, 420 U.S. at 786, 95 S.Ct. at 1293. It applies only in the absence of a legislative purpose to create two separate offenses. *United States v. Rone, supra*, 598 F.2d at 570.

■ The Court agrees with the Ninth Circuit, the only other court to have considered this issue, that Wharton's Rule does *See U. S. v. Rone, supra.*

not bar maintenance of Counts I and II. First, there is ample evidence that Congress intended to create both a conspiracy and a substantive offense in RICO. *Id.* at 570; *United States v. Ohlson, supra*, 552 F.2d at 1349. As the Supreme Court has stated in an analogous context, "[i]n drafting the Organized Crime Control Act of 1970, Congress manifested its clear awareness of the distinct nature of a conspiracy and the substantive offenses that might constitute its immediate end." *Iannelli v. United States, supra*, 420 U.S. at 788, 95 S.Ct. at 1295.

Second, § 1962(c), the substantive RICO section, does not necessarily require the participation of more than one person. The criminal activity proscribed by this section is not the formulation of an enterprise or association with the enterprise but the conduct of an enterprise's affairs through a pattern of racketeering activity, which conceivably can be committed by one person alone. *See United States v. Rone, supra*, 598 F.2d at 570. Although the enterprise must necessarily be composed of at least one individual, § 1962(c) by its terms does not require any element of agreement or concerted activity between this individual and the alleged RICO violator. *United States v. Ohlson, supra*, 552 F.2d at 1349. The enterprise is simply one of the jurisdictional elements of the statute. *Id.*

Accordingly, Wharton's Rule has no application to the concurrent charging of a RICO substantive and conspiracy count in one Indictment and Counts I and II may both be maintained.

### 6. *Statute of Limitations*

Defendants argue that Racketeering Acts 1–4, 15–40, 44–47 and 54–57 ("Racketeering Acts") are barred by the statute of limitations and must be stricken from the Indictment. Under § 1961(1)(B), racketeering activity includes by definition predicate acts which are "indictable" under certain federal statutes. Accordingly, since the five year federal statute of limitations has already run on the Racketeering Acts, defendants

---

**37.** The classic offenses which traditionally have come within the scope of the rule are adultery, incest, bigamy and dueling. *United States v. Rone, supra*, 598 F.2d at 569.

argue that the offenses are not presently "indictable" and cannot be included as predicate acts in Counts I and II.

█ RICO itself does not contain a specific statute of limitations provision. Section 1961 merely defines a "pattern of racketeering activity" as two or more acts of racketeering activity, the last of which occurred within ten years after the commission of a prior act of racketeering activity. 18 U.S.C. § 1961(6). Accordingly, whether an indictment based on purported RICO violations can be maintained, must be determined by recourse to the general federal statute of limitations for non-capital offenses, 18 U.S.C. § 3282, which allows an indictment to be brought up to five years after the commission of a federal offense. *See United States v. Davis*, 576 F.2d 1065, 1066 (C.A.3, 1978), *cert. denied*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978); *United States v. Forsythe*, 560 F.2d 1127, 1134 (C.A.3, 1977); *United States v. Cohen*, 444 F.Supp. 1314, 1320 (E.D.Pa.1978).

█ The Government clearly could not have charged defendants with separate counts based on the Racketeering Acts since all such acts occurred prior to July, 1975, and the five year limitation period would not be satisfied. Whether the time-barred offenses can be maintained as predicate acts in an alleged RICO violation is a question which apparently has been considered by only one other court. In *United States v. Field*, 432 F.Supp. 55, 59 (S.D.N.Y.1977), *aff'd without opinion*, 578 F.2d 1371 (C.A.2), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978), the court held that the five year statute of limitations does not bar a prosecution based on a pattern of racketeering which includes time-barred offenses where at least one of the purported predicate acts occurred within the five year period. In so holding the court observed:

> The [RICO statute] provides an example of a continuing offense for purposes of computing the time at which the statute of limitations begins to run. The "nature of the crime . . . is such that Congress must assuredly have intended that it be treated as a continuing one."

*Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970). The language of the Act, which makes a pattern of conduct the essence of the crime, "clearly contemplates a prolonged course of conduct." *Id.* at 120, 90 S.Ct. at 863. Like the statute of limitations for conspiracies, which runs from the date of the last overt act, *Grunewald v. United States*, 353 U.S. 391, 396–97, 77 S.Ct. 963 [969–70], 1 L.Ed.2d 931 (1957), the statute of limitations for violations of the Act runs from the date of the last alleged act of racketeering activity. *Id.*

Although the Third Circuit has not directly considered the issue, it has considered an analogous question in a line of cases construing subsection 1961(1)(A), which defines racketeering activity as an act "chargeable under state law." In *United States v. Forsythe*, 560 F.2d 1127 (C.A.3, 1977), the Court reversed the district court's dismissal of a RICO indictment wherein the pattern of racketeering activity was based on alleged violations of state law which were untimely made. The lower court had found that the indictment was returned after the state statute of limitations on the underlying predicate offenses had expired and accordingly it ruled that the RICO charge was time-barred. The Third Circuit reversed, holding that RICO violations would be governed by the federal, and not state, statute of limitations. Although the Court did not elaborate further on the application of the federal limitations provision, it noted that RICO was not passed to vindicate the predicate state law violations, but instead "was designed to punish the impact on commerce caused by conduct which meets the statute's definition of racketeering activity." *Id.* at 1135. Accordingly, the Court concluded that the predicate state law offenses are not the gravamen of a RICO violation and are incorporated into RICO for definitional purposes only. *Id.*

In a decision handed down a year later, the Third Circuit further defined the relationship between RICO predicate offenses based on state law violations and the feder-

al statute of limitations. In *United States v. Davis*, 576 F.2d 1065 (C.A.3), *cert. denied*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978), the Court held that under § 1962(c), racketeering activity encompassing a predicate act "which is chargeable under state law" means an act "chargeable under state law *at the time the offense was committed.*" *Id.* at 1067 (emphasis added). Accordingly, the Court ruled that the RICO indictment was timely returned even though two of the five predicate state offenses alleged in the indictment did not take place within the state statute of limitations.

The Third Circuit's decisions in *Davis* and *Forsythe* and the *Field* decision are instructive. Just as state predicate offenses are included in a RICO count for definitional purposes, so federal offenses enumerated in the statute also can be considered as yardsticks by which to measure racketeering activity. This view comports with the purpose of RICO, which is not to prevent the occurrence of the individual predicate acts themselves but to prevent the corruption of legitimate industry through a pattern of these predicate acts. Accordingly, in light of the continuing nature of a RICO violation, the logical point at which to trigger the statute of limitations is the time of the last predicate act comprising the pattern of racketeering activity. This conclusion is consistent with § 1961(5) which provides that a pattern requires at least two acts of racketeering activity, the last of which occurred within ten years after the commission of a prior act. If Congress intended to bar the inclusion of predicate acts in an indictment which occurred more than five years before the return of the indictment, the ten year provision would be relatively meaningless. *See* Bradley, *Racketeers, Congress and the Courts: An Analysis of RICO*, 65 Iowa L.R. 837, 850 (1980).

Defendants' motion to strike Racketeering Acts 1–4, 15–40, 44–47 and 54–57 from the Indictment will be denied.

### 7. *Racketeering Act 53*

■ As a final attack on the sufficiency of the Indictment, defendants argue that

Racketeering Act 53, the obstruction of justice allegation, is improperly included as a predicate act in Counts I and II and must be stricken. Essentially, defendants claim that Racketeering Act 53 is a separate and distinct substantive offense involving only Eugene Boffa, Sr., which is neither legally nor factually connected to Counts I or II. Continued inclusion of this predicate act in the RICO counts purportedly will unfairly and unjustifiably prejudice the remaining defendants.

Despite defendants' persistent search for defects in the Indictment, they have again come up empty-handed. Racketeering Act 53 charges that in November, 1975, Eugene Boffa, Sr., created a set of false cash receipts books for APL for submission to a federal grand jury in response to a subpoena *duces tecum*. The false entries reflected that defendant Sheeran had made monthly payments to APL for the rental of automobiles in 1974–75, when in fact he received the free use of these cars from Eugene Boffa, Sr., and Kalmar, as a reward for his participation in the fraudulent labor leasing scheme. This allegation on its face clearly constitutes part of the common scheme or plan alleged in the Indictment. Without the fabrication of these receipts, the purported illegal payments tendered to Sheeran might well have been uncovered by the investigating grand jury, leading to possible disclosure of defendants' overall conspiracy. Boffa's attempt to obstruct the grand jury process consequently can be viewed both as an attempt to cover up the completed predicate crimes alleged in the Indictment, and an effort to prolong the illegal activities in which he and his co-conspirators were allegedly engaged. *See United States v. Altomare*, 625 F.2d 5, 8, n.9 (C.A.4, 1980).

It is irrelevant, moreover, that none of the other defendants participated in, or were aware of, the actual preparation of the false records. A member of a conspiracy need not participate in, or have full knowledge of, each and every overt act committed by his co-conspirators. *See United States v. Diecidue*, 603 F.2d 535, 548

(C.A.5, 1979). So long as the defendant knowingly and willfully enters into a mutual understanding to engage in concerted action, he will be vicariously liable for all acts committed in furtherance of the scheme, if the acts fall within the common purposes of the conspiracy. *See United States v. Fitzgerald*, 579 F.2d 1014, 1018–19 (C.A.7), *cert. denied*, 439 U.S. 1002, 99 S.Ct. 611, 58 L.Ed.2d 677 (1978); *United States v. Addonizio*, 449 F.2d 100, 102 (C.A.3, 1971), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 737, 30 L.Ed.2d 746 (1972).[38]

Racketeering Act 53 on its face was properly included in Counts I and II and will not be dismissed.[39]

### D. *Double Jeopardy and Collateral Estoppel*

■ Defendant Sheeran has also moved to dismiss the present Indictment on the ground that its prosecution is barred by principles of double jeopardy and collateral estoppel.[40] Specifically, he claims that his previous acquittal by a jury of RICO charges contained in an Indictment returned by a grand jury of the Eastern District of Pennsylvania on September 24, 1979 ("the 1979 Indictment") bars the present prosecution. All other defendants except Lemon join in the motion.

The 1979 Indictment charged Sheeran and Louis J. Bottone with conspiracy to violate Section 1962(c) of Title 18 of the United States Code by participating in an "enterprise" affecting interstate commerce through a pattern of racketeering activity. The alleged enterprise consisted of "a group of individuals associated in fact for the purpose of enhancing, protecting, and perpetuating their individual and collective positions in the organized labor and organized criminal communities within which they associated by acts including murder, attempted murder, arson, and union embezzlement." [41] In addition to Sheeran and Bottone, the indictment named 14 other individuals associated with the enterprise, none of whom are defendants in the present prosecution. It alleged that the defendants conspired to and did conduct and participate in the affairs of the enterprise as follows:

a. Defendant FRANCIS J. SHEERAN would and did obtain the approval, e. g., "cleared," certain acts or affairs with Russell Bufalino prior to their being performed by members of the enterprise;

b. Russell Bufalino would and did take steps to protect defendant FRANCIS J. SHEERAN and other associates and employees of the enterprise;

c. Defendant FRANCIS J. SHEERAN would and did take steps to protect Charles Allen and other employees and associates of the enterprise;

d. Employees and associates of the enterprise would and did take steps to protect each other;

e. Charles Allen would and did carry out the orders of defendant FRANCIS J. SHEERAN;

f. Defendant FRANCIS J. SHEERAN would and did arrange to pay Charles Allen money for killing persons;

g. Defendant FRANCIS J. SHEERAN would and did arrange to pay Charles Allen money for committing arson;

h. Defendant LOUIS J. BOTTONE would and did arrange to pay Charles Allen money for killing a person;

---

**38.** Contrary to defendants' assertion, the obstruction of justice charge is sufficiently connected to the RICO offense to allow joinder of offenses under Rule 8 if the obstruction of justice allegation had been included in a separate count. *See United States v. Altomare, supra*, 625 F.2d at 8.

**39.** Defendant Boffa has also launched a broadside attack on the Indictment based on miscellaneous grounds, including claims that the Indictment is defective because the Grand Jury was incorrectly advised on the relevant law, and that Counts I or II of the Indictment fail to state a pattern of racketeering activity. Perhaps in recognition of the frivolous nature of these complaints, defendants have declined to brief these issues in their memorandum, preferring instead to rest on the bald statements contained in their motion. To the extent this opinion has failed to address any of these charges, the Court deemed the issues not worthy of discussion and the motion is denied.

**40.** D.I. 56.

**41.** D.I. 56, 1979 Indictment at p. 2.

i. Defendant LOUIS J. BOTTONE would and did attempt to secure the services of Charles Allen as a bodyguard and to intimidate union dissidents;

j. Defendant FRANCIS J. SHEERAN would and did issue checks drawn on the account of General Teamster Local 326 in the Bank of Delaware to Charles Allen as compensation to him for participating in the conduct of the affairs of the enterprise. (D.I. 56, 1979 Indictment at p. 4.)

The predicate crimes, allegedly comprising a pattern of racketeering under Section 1961(5) of Title 18 of the United States Code, were:

1.) The murder of John Gawronski on or about October 25, 1973, in violation of Sections 271(2)(a) and (6) and 636(a)(1) of Title 11 of the Delaware Code;

2.) The attempted murder of Leon Smallwood on or about October 25, 1973, in violation of Sections 271(2)(a) and (6), 531(2) and 636(a)(1) of Title 11 of the Delaware Code;

3.) The attempted murder of Robert W. Milligan on or about October 25, 1973, in violation of Sections 271(2)(a) and (6), 531(2) and 636(a)(1) of Title 11 of the Delaware Code;

4.) The attempted murder of George Fox in or about December of 1973 or January of 1974, in violation of New York Penal Law, Sections 20.00, 110.00 and 125.25(1);

5.) The travel and causing of travel from Pennsylvania to Delaware on or about December 28, 1975, of individuals with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity (arson) in violation of Sections 1952(a)(3) and (2) of Title 18 of the United States Code;

6.) The murder of Francis Marino on or about February 3, 1976, in violation of Sections 306(a) and (b)(3) and 2502(a) of the Pennsylvania Consolidated Statutes;

7.) The attempted murder of William Mario Brown from on or about December, 1975 up to and including February 3,

1976, in violation of Sections 2A:85–5, 2A:85–7, 2A:113–1, and 2A:113–2 of the New Jersey Statutes Annotated;

8.) The intentional setting fire to and causing an explosion with the intent of destroying a building, causing substantial destruction to a building, in violation of Sections 306(a) and (b)(3), and 3301(b) of Pennsylvania Consolidated Statutes;

9.) The embezzlement of the funds of a labor organization in violation of Section 501(c) of Title 29 of the United States Code. (*Id.* at pp. 4–13.)

The Indictment in the present action as discussed in detail above contains an entirely different set of charges.

As applied in criminal cases the doctrine of collateral estoppel is a corollary of the Double Jeopardy clause of the Fifth Amendment. In *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the seminal case establishing criminal collateral estoppel as a constitutional principle, the Supreme Court held that the doctrine:

> simply means that when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

*Id.* at 443, 90 S.Ct. at 1194.

In applying this principle it is necessary to ascertain whether an issue that the defendant seeks to exclude from consideration has actually been determined by the prior judgment. This is accomplished by examining

> the first proceeding to determine whether the jury in the first case might rationally have based its verdict " . . . upon an issue other than that which the defendant seeks to foreclose from consideration in the second case."

*United States v. Pappas*, 445 F.2d 1194, 1197 (C.A.3), *cert. denied*, 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971), *quoting Ashe v. Swenson, supra*, 397 U.S. at 444, 90 S.Ct. at 1194. If the jury could not have reached its verdict without resolving the issue in question in favor of the defendant then the issue is determined and the prose-

cution cannot argue to the contrary. If the jury could have reached its decision without resolving the issue, however, then it is not determined and the prosecution can argue that the issue should be decided adversely to the defendant.

No issue or charge contained in the present Indictment was put to the jury in the prior 1979 proceeding. In the 1979 Indictment the prosecution alleged that Sheeran and Bottone conspired to conduct an enterprise based on mutual protection, extortion, and murder, through a pattern of racketeering. That charge was altogether different from the present allegation of conspiracy to conduct an enterprise of obtaining financial benefits in certain businesses through a pattern of racketeering. The failure of the jury to find that the conspiracy charged in the 1979 Indictment existed does not preclude finding that the completely distinct conspiracy charged in the present Indictment did exist. The issues raised in the prior trial are not raised in the present Indictment. *A fortiori* the jury could have reached its decision to acquit without resolving any of the present issues in favor of the defendant. Consequently, the doctrine of collateral estoppel does not require dismissal of any portion of the present Indictment.

The defendant Sheeran argues that the conspiracy charged in the case *sub judice* is actually the same as that charged in the 1979 Indictment and that allowing the prosecution to proceed, therefore, would constitute double jeopardy. Although the defendant has not clearly separated his collateral estoppel from his double jeopardy argument, they should be distinguished. The two concepts are related, both being based on the double jeopardy clause of the Fifth Amendment. Collateral estoppel differs from the broader traditional rule against double jeopardy, however, in that it can preclude relitigation of an issue, even though the crimes charged in the two proceedings are admittedly distinct. Moreover, to be operative, collateral estoppel, at a minimum, requires a prior acquittal, while the general rule against double jeopardy

precludes a second prosecution for the same crime regardless of the verdict in the original proceeding. Sheeran's double jeopardy argument advanced here is based on the increasingly accepted position of the courts, that the rule against double jeopardy precludes a second prosecution for conspiracy if the defendant establishes that the same conspiracy is charged in both indictments, even if the prosecution does not rely on the same evidence and so, in that respect, does not litigate the same issues. *See United States v. Tercero*, 580 F.2d 312, 314 (C.A.8, 1978); *United States v. Papa*, 533 F.2d 815, 820 (C.A.2), *cert. denied*, 429 U.S. 961, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1976); *United States v. Mallah*, 503 F.2d 971, 985 (C.A.2, 1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975); *see also United States v. Inmon*, 568 F.2d 326, 332 (C.A.3, 1977), *cert. denied*, 444 U.S. 859, 100 S.Ct. 121, 62 L.Ed.2d 79 (1979).

It is true that the double jeopardy clause bars the government from repeated prosecution for what is in law and in fact one conspiracy. *See United States v. Tercero*, 580 F.2d 312, 314 (C.A.8, 1978). Courts have recognized that due to the complex nature of certain criminal conspiracies and the generally limited access that a defendant has to the proof that the government intends to offer, it can be unduly difficult to establish in support of a double jeopardy claim that allegedly separate conspiracies are, in fact, one. *See United States v. Stricklin*, 591 F.2d 1112, 1117–18 (C.A.5), *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979); *United States v. Inmon*, 568 F.2d 326, 329 (C.A.3, 1977), *cert. denied*, 444 U.S. 859, 100 S.Ct. 121, 62 L.Ed.2d 79 (1979); *United States v. Kamins*, 479 F.Supp. 1374, 1375 (W.D.Pa.1979). There is a danger that the government will "carve one large conspiracy into several smaller agreements." *United States v. Tercero*, 580 F.2d 312, 315 (C.A.8, 1978). Recognizing this difficulty, the Court of Appeals for the Third Circuit held, in *United States v. Inmon, supra*, that, although the burden of establishing that separately charged conspiracies are not distinct initially rests on the defendant

when a defendant makes a non-frivolous showing that an indictment charges the same offense as that for which he was formerly placed in jeopardy, the burden of establishing separate crimes—in this case separate conspiracies—is on the government.

568 F.2d at 331–32. The defendant argues that under this holding, the Indictment should be dismissed.

This argument fails because Sheeran has not made a non-frivolous showing that the present Indictment charges the same conspiracy as the 1979 Indictment. In support of his motion he states that both Indictments involve him in his capacity as the president of Local 326, both allege overt acts taking place in the same vicinity, and both encompass the same time period. These general similarities are not sufficient to establish a *prima facie* showing that the conspiracies are the same. Sheeran also has made much of the fact that at the first trial on the 1979 Indictment the government questioned him concerning his relationship to Eugene Boffa, Sr., a co-defendant in the present case. Eugene Boffa, Sr., was not charged in the 1979 Indictment, nor was he named as a co-conspirator. Even if he were, however, it would not establish a non-frivolous claim of double jeopardy. To support his argument that there was only one conspiracy, the defendant must show that there was only one agreement. *See Braverman v. United States*, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942). The sketchy facts that he has advanced here have no tendency to establish this, especially in view of the totally distinct nature of the charges set forth in the two Indictments. The two alleged agreements are completely separate. The Indictments allege totally distinct Enterprises under the RICO statute; they allege different predicate crimes to support the RICO charges; they name different co-conspirators; they name different overt acts. The only element common to both Indictments is the position of Sheeran as a defendant. The mere fact or allega-

tion that Sheeran has participated in both Enterprises "does not transform two separate conspiracies into one." *United States v. Papa*, 533 F.2d 815, 822 (C.A.2), *cert. denied*, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976).

The motion to dismiss based on double jeopardy and collateral estoppel will be denied.

## IV. *BILL OF PARTICULARS*

■ Defendants, Louis Kalmar and David Mishler, each have filed motions [42] for a bill of particulars pursuant to Rule 7(f), F.R.Cr.P. Kalmar's motion consists of 21 requests, the last having 5 subdivisions. (D.I. 54.) Mishler's motion seeks 12 categories of particulars. (D.I. 38.) The Government has responded to all of Kalmar's requests, except for those numbered 11, 12, 13 and 21(a) (D.I. 97), and has responded to Mishler's requests, except for those numbered 3–6, 7–9, and 11 & 12 (D.I. 98). The Government has objected to responding to these latter requests on the grounds that they are beyond the purpose of a bill of particulars, that they seek disclosure of the Government trial witnesses, or that they call for the Government to weave all the information at its command into the warp of a fully integrated trial theory for defendants' benefit.

The Court, having studied the matter, finds that the Government's objections are well taken and will enter an order sustaining those objections.

■ The purpose of the liberalized bill of particulars rule is to inform the defendant of the nature of the charges brought against him in order to adequately prepare his defense, to avoid surprise during the trial, and to protect him against a second prosecution for an inadequately described offense. *United States v. Cantu*, 557 F.2d 1173, 1178 (C.A.5, 1977), *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978). However, despite the liberality of

---

**42.** All other defendants, except Chandler Lemon, join in the motions of Kalmar and Mishler.

(D.I. 35, 52, 55, 60 and 72.)

the rule there are certain restrictions upon its use. One of the main policy reasons for restricting its applicability is to avoid "freezing" the Government's evidence in advance of trial. Such freezing comes about because of the rule that requires proof at trial to conform to the particulars furnished in a bill. *United States v. Neff*, 212 F.2d 297, 309 (C.A.3, 1954); *United States v. Allied Asphalt Paving Co.*, 451 F.Supp. 804, 812 (N.D.Ill.1978). Thus, the Court is required to balance restricting the Government's proof against protecting defendants from surprise. Here, however, the Indictment is definite and certain enough to safeguard defendants' rights and to enable them to properly prepare their defense, particularly in the light of the discovery that the Government has provided to the defendants [43] and the responses made to the unobjected requests for particulars.

▮▮▮▮ Furthermore, it is still firmly established that a defendant is entitled neither to a wholesale discovery of the Government's evidence, *United States v. Birrell*, 263 F.Supp. 113 (S.D.N.Y.1967), nor to a list of the Government's prospective witnesses, *United States v. Jaskiewicz*, 278 F.Supp. 525 (E.D.Pa.1968). Furthermore, there is no requirement that the Government weave all the information at its command into a warp of fully integrated trial theory for the benefit of the defendants, *United States v. Addonizio*, 451 F.2d 49, 64 (C.A.3), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972), *reh. denied*, 405 U.S. 1048, 92 S.Ct. 1309, 31 L.Ed.2d 591 (1972), nor is it necessary for the Government to disclose in a bill of particulars the precise details that a defendant and his alleged co-conspirators played in forming and executing a conspiracy or all the overt acts the Government will prove in establishing the conspiracy. *United States v. Carroll*, 510 F.2d 507, 509 (C.A.2, 1975), cert. denied, 426 U.S. 923, 96 S.Ct. 2633, 49 L.Ed.2d 378

(1976); *United States v. Cullen*, 305 F.Supp. 695, 699 (E.D.Wis.1969).

Thus, applying these principles to the particulars to which the Government objects, they need not be answered. Each of the requests seeks evidentiary minutia falling clearly within the proscribed area mentioned above and to force the Government to respond would unduly freeze it to its proof at trial without any significant benefit to the defendants except to open the door to an attempt to confuse the jury and the issues to be tried.

Accordingly, the Government will not be required (1) to disclose all its prospective witnesses as called for by Kalmar's request 11 and Mishler's requests 3–6, *United States v. Jaskiewicz, supra*, or (2) to make a wholesale disclosure of the Government's evidentiary minutia requested by Kalmar's requests 12 and 21(a) and Mishler's requests 3–6, 9, 11–12, *United States v. Addonizio, supra* at 64, or (3) to disclose the detailed information concerning the dates each person entered and left the conspiracy requested by Kalmar's requests 12, 13 and Mishler's requests 3, 7, 8 and 11, *United States v. Iannelli*, 53 F.R.D. 482, 483 (S.D.N.Y.1971); *United States v. Ahmad*, 53 F.R.D. 194, 199 (M.D.Pa.1971).

An order will be entered in accordance with this discussion.

## V. JOINDER AND SEVERANCE

### A. Rule 8(b)

All defendants, with the exception of Lemon, seek relief from prejudicial joinder under Rule 8(b) and request severance of their trials from certain of the other co-defendants.[44] Only Mishler filed a brief in support of this argument, in which the other defendants joined. The Government opposes the grounds proffered by Mishler for misjoinder, and argues that none of the

---

**43.** The Government has provided the defendants with copies of all documentary evidence that the Government intends to use at trial.

**44.** Defendant Mishler seeks a severance from defendants Sheeran and Lemon. Defendant Robert Boffa, Sr., requests a severance from

defendants Eugene Boffa, Sr., Sheeran, Kalmar and Lemon. The other defendants who have joined in these motions have not indicated from which defendants they seek a severance under Rule 8(b).

defendants have presented sufficient justification for severance. The Government does not oppose Mishler's severance request, however, in accordance with an agreement which calls for Mishler to testify at trial as a prosecution witness in return for the Government's consent to his severance motion.

 Rule 8(b) permits the joint trial of defendants if they are "alleged to have participated in the same act or transaction or in the same series of acts or transactions which constitute an offense or offenses." Two interests must be balanced in determining whether joinder is proper—the interest in avoiding the potential prejudice that may result from consolidating multiple defendants, and the public interest in promoting judicial and prosecutorial economy through joint trials. *See United States v. Adams*, 581 F.2d 193, 197 (C.A.9), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *United States v. Niederberger*, 580 F.2d 63, 66 (C.A.3), *cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978). Rule 8(b) sets "the limits of tolerance" for this process, *King v. United States*, 355 F.2d 700, 703 (C.A.1, 1966), and requires severance of defendants as a matter of right where these limits are exceeded. *United States v. Levine*, 546 F.2d 658, 661 (C.A.5, 1977).

 In this case, the relevant inquiry under Rule 8(b) is whether the predicate acts alleged in Count I constitute "the same act or transaction" or the "same series of acts or transactions." Ordinarily, where acts are alleged to be part of a single conspiracy, this link is sufficient to satisfy joinder of defendants under Rule 8(b). *See United States v. Adams, supra*, 581 F.2d at 193; *United States v. Somers*, 496 F.2d 723, 729–30 (C.A.3), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). Defendants argue, however, that the conspiracy alleged in this case violates the multiple conspiracy doctrine of *Kotteakos* and that joinder accordingly is not proper. This Court has already considered and rejected this contention in the context of defendants' motion to dismiss. Accordingly, joinder of the defendants was permissible under Rule 8(b) and severance on the grounds of misjoinder is denied.

 The Court will grant Mishler's motion for severance, however, for the following reasons. As stated previously, the Government has entered into an agreement with Mishler whereby Mishler has consented to testify as a prosecution witness in return for the concurrence of the Government in his motion for severance. The Government represents that "Mishler's testimony will appreciably shorten the trial of this indictment" and that "it is in the best interests of the public, the government and defendant Mishler to fulfill this agreement." The Court recognizes that it was within the Government's power as a matter of prosecutorial discretion to charge Mishler in a separate indictment, to seek a grant of immunity in exchange for his testimony, or otherwise to negotiate some agreement whereby the charges against Mishler would be lessened or dismissed. The Court thus believes that although this agreement now requires the sanction of the Court, the Government could have effected what it now seeks to accomplish in the first instance, without Court approval. Accordingly, in deference to the prosecutorial discretion of the Government, and its considered judgment that judicial economy will be served if this agreement is honored, the Court will order that the trial of defendant Mishler be severed from the other defendants.

In all other respects, the motions for severance based on Rule 8(b) will be denied.

## B. *Rule 14*

All defendants, including Chandler Lemon, alternatively seek a severance from certain of the other co-defendants under Rule 14.[45] Although Rule 14 can be characterized as a conceptual cousin of Rule 8, the two provisions are admittedly distinct. Rule 14 comes into play only when joinder of defendants already has been deemed proper

---

**45.** Defendant Lemon seeks a severance from defendants Eugene Boffa, Sr. and Sheeran.

under Rule 8(b), but the defendants nonetheless argue that such joinder will be prejudicial.[46]

Defendants allege as their primary source of prejudice that the Government will introduce in evidence tape-recorded conversations between defendants Eugene Boffa, Sr. and Sheeran, and one Charles Allen, a self-confessed murderer, drug dealer, mob functionary and government informant.[47] Allen purportedly has become a "household word" to many citizens in Delaware and surrounding states and "his name has become synonymous with murder, violence, organized crime and all the evils associated therewith."[48] Consequently, Allen's testimony against defendants Boffa and Sheeran at a joint trial with the other co-defendants purportedly will create "the very real possibility that [the remaining defendants] will be convicted on the basis of 'guilt by association' unsupported by the factual record."[49]

 The general rule provides that defendants who are jointly indicted should be tried together. *United States v. Karas,* 624 F.2d 500, 504 (C.A.4, 1980); *United States v. Frumento,* 405 F.Supp. 23, 31 (E.D.Pa.1975); *United States v. Clark,* 398 F.Supp. 341, 354 (E.D.Pa.1975), *aff'd without opinion,* 532 F.2d 745 (C.A.3, 1976). Severance under Rule 14 is warranted only if a defendant clearly demonstrates that he will be so severely prejudiced by joinder that he will in effect be denied a fair trial. *United States v. Frumento, supra,* 405 F.Supp. at 31; *United States v. Hansen,* 422 F.Supp. 430, 434 (E.D.Wis.1976). Under this stringent standard, the fact that a defendant might have a better chance of acquittal if he is separately tried, in and of itself, is insufficient to justify severance. *United States v. Clark, supra,* 398 F.Supp. at 355.

 The disposition of a Rule 14 motion is committed to the sound discretion of the trial court. *United States v. Campanale,* 518 F.2d 352, 359 (C.A.9, 1975), *cert. denied sub nom. United States v. Matthews,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); *United States v. Somers,* 496 F.2d 723, 730 (C.A.3), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974); *United States v. Cohen,* 444 F.Supp. 1314, 1317 (E.D.Pa.1978). The ultimate issue in determining the propriety of severance is whether the jury can reasonably be expected to compartmentalize the evidence as it relates to each individual defendant, in view of its volume and limited admissibility. *United States v. Somers, supra,* 496 F.2d at 730. While the possibility of guilt by association persists in any joint trial, this ground alone does not afford a basis for severance. As stated by the Supreme Court:

> This type of prejudicial effect is acknowledged to inhere in criminal practice, but it is justified on the grounds that (1) the jury is expected to follow instructions in limiting this evidence to its proper function, and (2) the convenience of trying different crimes against the same person, and connected crimes against different defendants, in the same trial is a valid governmental interest.

*Spencer v. Texas,* 385 U.S. 554, 562, 87 S.Ct. 648, 652, 17 L.Ed.2d 606 (1967); *United States v. Frumento, supra,* 405 F.Supp. at 31.

 Against this backdrop of general principles, the Court concludes that the defendants have failed to make out a sufficient case for severance. The Indictment charges one single conspiracy and if the evidence adduced at trial establishes this fact, the Allen tapes will be admissible against each of the defendants. In conspiracy cases, where a charge against each defendant will be proven by the same evi-

---

**46.** Rule 14 provides in pertinent part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

**47.** D.I. 44, ¶¶ 2, 4.

**48.** *Id.* at ¶ 5.

**49.** *Id.* at ¶ 9.

dence, a severance should not be granted except in extenuating circumstances. *United States v. Clark, supra*, 398 F.Supp. at 355. Alternatively, in this Circuit, a defendant is not entitled to a severance merely because the evidence admissible against a co-defendant is more damaging than that admissible against the moving party. *United States v. Somers, supra*, 496 F.2d at 730. The Court presumes that the jury will confine its consideration of the evidence to the defendant against whom it was admitted, as will be charged by the Court. *See United States v. Karas, supra*, 629 F.2d at 504. Mere speculation that the jury will not follow the instructions of the Court and instead will transfer guilt from one defendant to another will not justify a severance under Rule 14. *See United States v. Cohen, supra*, 444 F.Supp. at 1317.

Defendants' motions for severance pursuant to Rule 14 will be denied.

## VI. *MOTION TO SUPPRESS STATEMENTS MADE TO CHARLES ALLEN*

■■■ Defendants Eugene Boffa, Sr., and Sheeran, joined by all other defendants except Lemon, have also moved for an order "suppressing all evidence of oral statements made by him [sic] to Charles Allen, or otherwise intercepted by agents of the United States Government from December 1978 to the present" on the grounds that the statements were obtained in violation of defendants' Fourth Amendment right against unreasonable searches and seizures, their Fifth Amendment privilege against self-incrimination and their Sixth Amendment right to assistance of counsel and on the ground that the statements were involuntary and therefore inadmissible under 18 U.S.C. § 3501.[50] Defendants' contentions are based upon the following factual allegations:

In the fall of 1978, Charles Allen, an alleged co-conspirator of Francis Sheeran in a prior indictment brought by the government against Sheeran in another district, agreed to work for the government as an informer. In return for his services, Mr. Allen was to receive a sentence of not more than seven years, placement in the U. S. Marshal's witness protection program, and compensation on a per diem basis. Pursuant to this agreement, Allen met with Sheeran, Eugene Boffa, Sr., and other alleged co-conspirators in a number of meetings which were surreptitiously recorded on tape and overheard by government agents. Before the meetings, Allen was given specific instructions by the government to elicit specific information and was rehearsed by the government. Pursuant to these instructions he obtained admissions of complicity in wrongdoing from Sheeran and other defendants by means of his "preprogrammed deceit, cajolery and trickery." These conversations took place between December, 1978 and February, 1979. None of the defendants were in custody at the time the disclosures took place and all conversations occurred well before the present Indictment was returned.

Even assuming the truth of all the foregoing allegations, considered in a light most favorable to defendants, suppression is clearly unwarranted on the basis of any of the grounds asserted by defendants and, consequently, no hearing will be necessary.

■■■ First, it is clear that no Fourth Amendment violation has been made out. The use of undercover agents and informers to elicit incriminating statements from potential criminal defendants does not constitute unreasonable search and seizure prohibited by the Fourth Amendment, *United States v. White*, 401 U.S. 745, 91 S.Ct. 122, 28 L.Ed.2d 453 (1971); *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Lewis v. United States*,

---

**50.** D.I. 94. Defendants have filed a supporting memorandum with this motion (D.I. 94) and the Government has responded with an opposing memorandum (D.I. 119). Although defendants filed this particular motion over three weeks after the Court's deadline for the filing of pretrial motions (*see* D.I. 33), and, given the grounds asserted in their motion, have failed to show good cause for the delay (*see* D.I. 104), the Court, nevertheless, will decide the motion on its merits and, therefore, has carefully considered the submissions of the parties.

385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). Similarly the preplanned use of misrepresentation and/or trickery by undercover agents, informers, or known law enforcement agents to elicit incriminating statements for potential criminal defendants has been held not to be an unreasonable search and seizure. *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *Brown v. Brierly*, 438 F.2d 954 (C.A.3), cert. denied, 402 U.S. 997, 91 S.Ct. 2182, 29 L.Ed.2d 163 (1971). Finally, the surreptitious concealment, by an informant or undercover agent, of a transmitting device and/or a recording device on his body by means of which his conversations with the object of a criminal investigation are transmitted and/or recorded does not violate the Fourth Amendment. *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1970); *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

■ Of course, the question of whether or not there has been an unreasonable search or seizure cannot be governed by any hard or fast rules but must be answered by reference to all the specific facts involved in each case. *Hoffa v. United States, supra*, 385 U.S. at 301–02, 87 S.Ct. at 413–14. The totality of the circumstances alleged here lead the Court to the conclusion that there has been no unreasonable search and seizure. As the Supreme Court has noted:

> The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak.

*Hoffa v. United States, supra*, 385 U.S. at 303, 87 S.Ct. at 414, quoting *Lopez v. United States, supra*, 373 U.S. at 465, 83 S.Ct. at 1401 (Brennan, J., dissenting). Here, defendants mistakenly placed their trust in a "colleague" who had in fact defected to the government. The fact that he tricked them, lied to them and used their trust and

a script prepared by the government to cajole admissions out of them does not violate any interest protected by the Fourth Amendment. Defendants knew that Allen was with them and listening to any statements that they made. They knowingly and voluntarily responded to his questions, comments and suggestions. The Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa v. United States, supra*, 385 U.S. at 302, 87 S.Ct. at 414. This Court refuses to elevate the myth of "honor among thieves" into a constitutional precept.

■ The Court also concludes that the government's and Allen's alleged conduct did not violate defendants' Fifth Amendment right against self-incrimination. Defendants contend that their Fifth Amendment rights were violated because the totality of the circumstances alleged warrant the conclusion that an "interrogation" took place and that the warnings mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) should have preceded such interrogation. Even assuming that an "interrogation" took place, no Miranda warnings were required because defendants were not in custody. It is well established that the Miranda warnings are only required before "custodial interrogations." *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Hoffa v. United States, supra*, 385 U.S. at 303–04, 87 S.Ct. at 414–15; *Miranda v. Arizona, supra*; *United States v. Mesa*, 638 F.2d 582 (C.A.3, 1980). The term "custodial interrogation" was defined in *Miranda* to mean "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. In *United States v. Mesa, supra*, the Third Circuit held that two elements must be present before an individual can be deemed to be "in custody." First, at a minimum "the police must have immediate control over the suspect— they can restrain him and subject him to their questioning and apply whatever psy-

chological techniques they think will be most effective." *Id.* at 586. Secondly, if there is such immediate control over the suspect, the suspect can only be deemed "in custody" if, in addition, "he is also not free to leave." *Id.* at 587. It is clear that defendants in the present action have failed to allege either element of "custody." Defendants allege only that Allen used deceit, trickery and cajolery to induce them to remain with him and respond to his questions. This clearly is not the type of immediate physical control which, under *Mesa*, must exist in order for there to be custody. Secondly, defendants have not alleged that they were not free to leave at any time—no physical restraint is alleged whatsoever.

▪ The Court has also concluded that Allen's alleged conduct did not violate defendants' Sixth Amendment right to counsel. The Sixth Amendment right to counsel attaches only at "points of time at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *Hoffa v. United States, supra; Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Although it is clear that under *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), Allen's alleged conduct would have violated defendants' Sixth Amendment right to counsel if it had occurred *after* adversary proceedings had begun, it is equally clear that the proceedings had not begun. Defendants contend that Allen's "interrogations" occurred at a point of time where, although no formal proceedings had begun, the Government had already decided to prosecute and was merely garnering additional ammunition. Thus, defendants argue, the Government had moved from an investigational to a prosecutorial stage of the proceedings and the "guiding hand of counsel" was necessary. Relying on *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), defendants argue that as a practical matter proceedings had begun and the Sixth Amendment right to counsel had attached.

Reduced to its bare essentials, defendants' argument is essentially that at any time after the Government has amassed enough evidence to indict and has decided that it will indict at some point in the future, the potential defendant is entitled to the full panoply of Sixth Amendment protections in any dealing with the Government or its informants. This argument was specifically rejected in *Hoffa v. United States, supra*, 385 U.S. at 309–10, 87 S.Ct. at 417–18. Moreover, defendants' reliance on *Escobedo* is misplaced.

The Supreme Court has indicated that *Escobedo* must be limited to its narrow and unusual facts. *Michigan v. Tucker*, 417 U.S. 433, 438, 94 S.Ct. 2357, 2360, 41 L.Ed.2d 182 (1974). The present case is certainly distinguishable from *Escobedo* where the defendant was in custody, had actually retained counsel and was purposefully denied access to that counsel to enable the police to extract damaging admissions from him. This Court is convinced that by no stretch of the imagination could the allegations made in support of the present motion be considered the functional equivalent of the initiation of adversary proceedings and therefore concludes that no Sixth Amendment right was violated.

▪ Defendants' final argument for suppression is based on statutory grounds. They argue that Allen's alleged methods were such that any admissions made by defendants could not be considered voluntary and thus would be inadmissible under 18 U.S.C. § 3501. This argument is utterly frivolous. That statute clearly does not extend the rights of criminal defendants beyond the scope of protection afforded by the Constitution. *United States v. White*, 417 F.2d 89 (C.A.7, 1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 910, 25 L.Ed.2d 92 (1970); *cf. United States v. Crook*, 502 F.2d 1378 (C.A.3, 1974), *cert. denied*, 419 U.S. 1123, 95 S.Ct. 808, 42 L.Ed.2d 823 (1975).

Consequently, defendants' motion to suppress must be denied in its entirety.

## VII. MOTION FOR PRETRIAL EVIDENTIARY HEARING TO DETERMINE ADMISSIBILITY OF CO-CONSPIRATORS' STATEMENTS

Defendant Mishler, joined by the other defendants except Lemon, moves for a pretrial evidentiary hearing to determine the admissibility of certain evidence as statements of co-conspirators, or, in the alternative, an imposition of an order of proof, requiring the Government to introduce independent evidence proving the existence of a conspiracy, before offering the statements in question.[51]

 Out-of-court declarations by a conspirator during the course and in furtherance of the conspiracy are admissible against co-conspirators as well as the declarant, such evidence not being excluded by the hearsay rule. *United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974); *United States v. Continental Group, Inc.*, 603 F.2d 444, 456 (C.A.3, 1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980); F.R.E. 801(d)(2)(E). It is the province of the trial judge to determine whether evidence meets this standard of admissibility. *United States v. Nixon, supra*, at 701 n. 14, 94 S.Ct. 3104 n. 14; *United States v. Trowery*, 542 F.2d 623, 626–27 (C.A.3, 1976), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977); *United States v. Bey*, 437 F.2d 188, 191–92 (C.A.3, 1971); F.R.E. 104(a). As a prerequisite to admission, the Court must determine that the prosecution has proved the existence of a conspiracy by a preponderance of the evidence independent of the out-of-court declarations of the alleged co-conspirator. *United States v. Continental Group, Inc., supra*, at 457; *United States v. Trowery, supra*, at 627. Courts have held that when practical, it is preferable to have the Government present its prerequisite evidence of conspiracy before introducing the out-of-court declarations. *See United States v. Continental Group, Inc., supra*, at 456–57; *United States v. James*, 590 F.2d 575, 582 (C.A.5), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Courts have also recognized, however, that frequently, this preferred order of proof is not practical. As the Court of Appeals for the District of Columbia held recently:

[M]any times witnesses are in possession of both hearsay testimony of co-conspirators and evidence that independently tends to prove the existence of the conspiracy. Given the myriad of difficulties that surround the availability of witnesses, it is just impractical in many cases for a court to comply strictly with the preferred order of proof by taking the testimony of such witnesses piecemeal, waiting until a conspiracy is fully proved by independent evidence, and then recalling from their normal pursuits, those who testify to hearsay declarations of co-conspirators.

As a concession to such practical impediments that arise during trial, the court is vested with considerable discretion to admit particular items of evidence "subject to connection." *U. S. v. Vaught*, 485 F.2d 320, 323 (4th Cir. 1973) . . . .

*United States v. Jackson*, 627 F.2d 1198, 1218 (C.A.D.C.1980). This discretion of the district court is widely recognized. *E. g., United States v. Andrews*, 585 F.2d 961, 966 (C.A.10, 1978); *United States v. Weiner*, 578 F.2d 757, 768 (C.A.9), *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978); *United States v. Stanchich*, 550 F.2d 1294, 1296–97 (C.A.2, 1977); *United States v. Leaman*, 546 F.2d 148, 150 (C.A.5), *cert. denied*, 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977). It is exercised in order to allow a logical presentation of evidence. *See United States v. Hassell*, 547 F.2d 1048, 1052 (C.A.8), *cert. denied*, 430 U.S. 919, 97 S.Ct. 1338, 51 L.Ed.2d 599 (1977).

In the past this Court has exercised its discretion to admit statements of co-conspirators subject to later connection to independent evidence for the purpose of allowing a logical presentation of evidence. In *United States v. Sinclair*, 433 F.Supp. 1180 (D.Del.), *aff'd*, 566 F.2d 1171 (C.A.3, 1977), the defendant moved for acquittal or a new

---

**51.** D.I. 37.

**492**

trial following a conviction of conspiracy to commit mail fraud, arguing, *inter alia*, that statements of co-conspirators were improperly admitted. The court denied the motion, holding:

> The Court, in its discretion, may allow [admission of evidence subject to connection] ... if the Government represents ... that strict adherence to the evidentiary foundation would disrupt the logical presentation of its case and confuse the jury.

*Id.* at 1190–91.

In *United States v. Vespe*, 389 F.Supp. 1359 (D.Del.), *aff'd*, 520 F.2d 1369 (C.A.3, 1975), *cert. denied*, 423 U.S. 1051, 96 S.Ct. 779, 46 L.Ed.2d 640 (1976), the court refused to grant a motion for acquittal or a new trial, holding that it had properly allowed the prosecution to introduce statements of co-conspirators subject to connection, pursuant to the representation of the prosecutor that doing so would serve the ends of clearly presenting the evidence. *Id.* at 1369–70.

■ Government counsel in the present case has represented that permitting the introduction of the statements of co-conspirators subject to connection will serve the goal of a "fair, orderly and logical presentation of evidence at trial," and that the alternative—the use of a pre-trial evidentiary hearing or the imposition of an order of proof—would fragment the presentation of evidence and cause impractical use of witnesses and a protracted trial.[52] The Court, moreover, is aware of the difficulties associated with the availability of witnesses, which obviously would be compounded by requiring multiple testimony by the same individual. For these reasons the Court will deny the motion, reserving the discretion to admit statements of co-conspirators subject to subsequent connection to a conspiracy.

**52.** D.I. 96, pp. 81–82.

**53.** D.I. 68.

**54.** Originally all the defendants, except Chandler Lemon, formally joined all the motions of the other defendants (D.I. 35, 52, 55, 60, 72);

## VIII. *MOTION TO ORDER PSYCHIATRIC EXAMINATION OF GOVERNMENT WITNESS*

Eugene Boffa, Sr., joined by the other defendants except defendant Lemon, has moved the Court to order a psychiatric examination of Charles Allen, a Government witness.[53] The only support offered for the motion is the affidavit of Eugene Boffa, Sr.'s attorney, James C. Schwartzman, stating that he has "made a full and complete investigation" of the matter, revealing that Allen has "a long history of apparent severe psychological abnormalities." This leads Mr. Schwartzman to conclude that examination by a competent psychiatrist would prove Allen "totally unworthy of belief." The affiant does not state the factual basis for these conclusions.

The decision whether to order a psychiatric examination of a witness is within the sound discretion of the District Court. *See Government of Virgin Islands v. Scuito*, 623 F.2d 869, 875 (C.A.3, 1980); *United States v. Butler*, 481 F.2d 531 (C.A.D.C.1973). Such discretion should not be exercised, absent a sound factual predicate and a showing that the invasion of the privacy of the witness is necessary and justified. *See United States v. Rader and Rader*, No. 76–44 (D.Kan. Dec. 10, 1976); *United States v. Butler*, 325 F.Supp. 886, 887 (C.A.D.C.1971), *affirmed* 481 F.2d 531 (C.A.D.C.1973).

Because the factual predicate and a showing of necessity or justification has not been met, the motion will be denied.

## IX. *SEQUESTRATION OF JURORS*

The defendant Sheeran is the only defendant who now insists that the jurors should be sequestered throughout the trial.[54] (D.I. 58; D.I. 113, pp. 36–47). His motion is based on the fear that possible publicity by the news media of unfavorable

however, each of them at oral argument changed their positions and each now opposes Sheeran's motion to sequester the jury. (D.I. 113, pp. 36, 47, 49–51). The Government likewise sees no necessity to sequester the jury (D.I. 96, pp. 63–64; D.I. 113, pp. 51–52).

matters which will not be presented in evidence may come to the juror's attention and thus unduly prejudice his right to a fair trial in violation of the Due Process Clause. (D.I. 113, pp. 36–47).

 Whether jurors will be sequestered or allowed to disperse during trial is a matter of sound discretion with the trial court. *United States v. Johnson*, 584 F.2d 148, 154 (C.A.6, 1978), *cert. denied*, 440 U.S. 918, 99 S.Ct. 1239, 59 L.Ed.2d 469 (1979); *United States v. Hall*, 536 F.2d 313, 326 (C.A.10), *cert. denied*, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976); *cf. United States v. Piancone*, 506 F.2d 748, 750 (C.A.3, 1974). While the Court may anticipate some news media publicity during the trial, it does not believe that it will be so massive and pervasive that it cannot be controlled by strict admonitions to the jurors. Furthermore, the fear of some media publicity is seldom a sufficient reason alone for subjecting the jurors to the inconvenience of sequestration. *Margoles v. United States*, 407 F.2d 727, 732–35 (C.A.7), *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). The trial is estimated to last five to six weeks and it must be recognized that sequestration subjects jurors and their families to burdensome hardships and makes it extremely difficult to obtain a fair cross-section of the community to serve on the jury. Therefore, sequestration should not be ordered unless it appears to be strictly necessary to prevent outside interference. *United States v. Boykin*, 275 F.Supp. 16, 18 (M.D.Pa.1967), *aff'd*, 398 F.2d 483 (C.A.3, 1968), *cert. denied*, 393 U.S. 1032, 89 S.Ct. 645, 21 L.Ed.2d 575 (1969).

The nature of the charges to be tried in this case are such that they alone are not likely to carry banner headlines and it is believed that the fear of prejudicial publicity can be controlled by admonitions of the Court and the conscientiousness of the jurors to perform fairly and properly their duties without being subjected to extended periods of personal confinement during what is anticipated to be a rather long trial.

Accordingly, Sheeran's motion to sequester the jurors on the possibility of prejudicial publicity will be denied.

## X. DISCOVERY OF GRAND JURY RECORDS

Defendants have filed two separate motions for discovery of information concerning the circumstances giving rise to the instant indictment.[55] These motions allege two general claims of prosecutorial impropriety in securing the Indictment and seek two corresponding classes of discovery.

### A. General Discovery

Defendants first argue that the Indictment is defective because of prosecutorial misconduct in presenting the evidence to the grand jury. Defendants claim that from December, 1974 to July, 1980 when the Indictment was returned, at least three separate grand juries conducted an investigation of defendants—the Delaware Grand Jury which returned the instant Indictment and at least two Grand Juries sitting in the Eastern District of Pennsylvania (Philadelphia Grand Juries). The Philadelphia Grand Juries concluded their investigations prior to July, 1980, apparently without returning any indictments. Defendants allege that the Philadelphia Grand Juries conducted all or most of the investigation of the defendants and that selected portions of the evidence obtained from these investigations were presented by the Government to the Delaware Grand Jury. As a result, defendants complain that: (1) the Government violated the provisions of Rule 6(e), F.R.Cr.P., by transferring and disclosing to the Delaware Grand Jury without the benefit of a court order documents and other evidence obtained by the Philadelphia Grand Juries; (2) the Government improperly failed to present to the Delaware Grand Jury *all* the evidence obtained by the Philadelphia Grand Juries, and specifically excluded exculpatory material; (3) the instant Indictment, accordingly, is based primarily upon selectively presented hearsay evidence; and (4) the Delaware Grand Jury

---

**55.** D.I. 42 & 43.

thus abdicated its constitutional responsibility by failing to conduct a meaningful and independent investigation of defendants, in violation of defendants' due process rights. Defendants seek wholesale discovery of information concerning the Delaware and Philadelphia Grand Juries, including copies of all recorded testimony given before the Delaware Grand Jury.

Defendants' arguments suffer from both factual and legal infirmities. First, the Government has provided to the Court for *in camera* inspection a certified copy of a sealed Order from the District Court for the Eastern District of Pennsylvania authorizing the disclosure and transfer of all documents obtained and testimony given to the federal Grand Juries impaneled in the Eastern District of Pennsylvania which previously investigated the subject areas of the present Indictment. Consequently, defendants' major ground for complaint, that the Government improperly transferred documents and other evidence from the Philadelphia Grand Juries to the Delaware Grand Jury, is without merit.

Second, defendants have not presented sufficient grounds for lifting the veil of secrecy surrounding the Grand Jury proceedings. Defendants' failure to make the threshold showing required for discovery can best be appreciated after consideration of the factors underlying the secrecy requirement.

 The rule preserving the confidentiality of grand jury proceedings first emerged in the 17th century and has remained an integral part of our criminal justice system. *See Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218 n.9, 99 S.Ct. 1667, 1672 n.9, 60 L.Ed.2d 156 (1979). The justifications for this policy are multifold: (1) to prevent a party whose indictment may be contemplated from escaping; (2) to prevent perjury or tampering with witnesses who may testify before the grand jury and later at trial; (3) to encourage free and untrammelled disclosure of information; (4) to insure that the grand jurors engage in unrestrained investigation and deliberation; and (5) to protect the reputation of a targeted party who is not indicted. *United States v. Procter & Gamble*, 356 U.S. 677, 681, n.6, 78 S.Ct. 983, 985, n.6, 2 L.Ed.2d 1077 (1958); *United States v. Malatesta*, 583 F.2d 748, 752 (C.A.5, 1978), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). This policy of secrecy is codified in Rule 6(e), F.R.Cr.P., which provides contempt sanctions for unauthorized disclosures of grand jury matters by grand jurors, attorneys for the government and other non-witness participants in grand jury proceedings.

 Discovery of grand jury proceedings may be permitted by a court at the request of the defendant, "upon a showing that grounds may exist for a motion to dismiss the indictment" because of improper conduct affecting the grand jury. F.R. Cr.P. 6(e)(2)(C)(1).[56] In *United States v. Procter & Gamble, supra*, a case involving disclosure of grand jury materials for use in civil litigation, the Supreme Court stated in general terms that the "indispensible secrecy . . . must not be broken except where there is a compelling necessity. There are instances where the need [for disclosure] will outweigh the countervailing policy. But they must be shown with particularity." *Id.* at 682, 78 S.Ct. at 986. In *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), the court implied that it would relax this requirement in instances where criminal defendants requested grand jury materials. In that case, although the Court nominally affirmed the use of the "particularized need" test, it further recognized that "disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration

---

**56.** A criminal defendant, however, is entitled as of right to certain grand jury materials. A defendant may request a transcript of his own testimony before the grand jury once he has been indicted. *See* F.R.Cr.P. 16(a)(1)(A). Additionally, under the Jencks Act, a defendant has a right to receive a transcript of the grand jury testimony of any witness who testifies at trial, after the attorney has concluded his direct examination of the witness. *See* 18 U.S.C. § 3500(e)(3).

of criminal justice," and that "it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant facts." *Id.* at 870, 86 S.Ct. at 1849. In a recent case, again involving civil litigants, however, the court returned to its earlier stringent interpretation of the "particularized need" requirement and held that "parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil Company of California v. Petrol Stops Northwest,* 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979); *see generally United States v. Mahoney,* 495 F.Supp. 1270 (E.D.Pa.1980).

■ Once the grand jury has completed its work, and indictments have been returned, the reasons for secrecy obviously become less compelling and disclosure of grand jury matters is warranted when justice so requires. *See e. g., United States v. Socony-Vacuum Oil Company,* 310 U.S. 150, 234, 60 S.Ct. 811, 849, 84 L.Ed. 1129 (1940); *State of Wisconsin v. Schaffer,* 565 F.2d 961 (C.A.7, 1977); *Beatrice Foods Co. v. United States,* 312 F.2d 29 (C.A.8), *cert. denied,* 373 U.S. 904, 83 S.Ct. 1289, 10 L.Ed.2d 199 (1963); *In re Grand Jury Investigation of Ven-Fuel,* 441 F.Supp. 1299 (M.D.Fla.1977). As Judge Lord recently noted in *United States v. Mahoney, supra,* once the grand jury dissolves, only one of the distinct interests served by confidentiality of the proceedings remains—the concern for encouraging full and frank disclosures by persons having information of criminal activity. 495 F.Supp. at 1273. This interest, however, is by no means minor. As the Supreme Court noted in *Douglas Oil Co.:*

> [I]n considering the effects of disclosure on grand jury proceedings, the courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries. Persons called upon to testify will consider the likelihood that their testimony may one day be disclosed to outside parties. Fear of future retribution or social stigma may act as powerful deterrents to those who would come forward and aid the grand jury in the performance of its duties. . . . Thus, the interests in grand jury secrecy, although reduced, are not eliminated merely because the grand jury has ended its activities.

441 U.S. at 222, 99 S.Ct. at 1674.

■ In this case, the grand jury term has not yet expired and the Court is thus hesitant to order the requested discovery of the grand jury records at this time without demonstration of a compelling necessity. The Grand Jury is expected to end its activities shortly, however, before defendants are brought to trial and at that point defendants will have a "lesser burden" in justifying disclosure. *Id.* at 223, 99 S.Ct. at 1675. Even this burden, however, is not insubstantial. In determining whether to exercise its discretion to grand discovery, the Court must carefully balance the defendants' asserted reasons for disclosure with the public policies militating in favor of secrecy. As noted above, the interest in encouraging future witnesses to provide information freely and openly is of paramount importance to the vitality of future grand juries. "[T]he grand jury as a public institution serving the community might suffer if those testifying today knew that the secrecy of their testimony would be lifted tomorrow." *Procter & Gamble, supra,* 356 U.S. at 682, 78 S.Ct. at 986. Liberal disclosure of the requested grand jury records might particularly compromise future grand jury investigations of possible RICO violations since those investigations are likely to involve elements of organized crime and witness' fears of possible reprisals are likely to be more acute. Accordingly, even under a "lesser burden" standard, defendants must demonstrate sufficient need for the requested materials to outweigh the important interest in preserving their confidentiality.

As grounds for their disclosure requests, defendants offer the following arguments:

The offenses underlying the Indictment were purportedly investigated by the Philadelphia Grand Juries *seriatim* for approximately four years and no indictments were returned. The Delaware Grand Jury which returned the challenged Indictments allegedly investigated defendants for less than eight months. From these facts alone defendants conclude: that the Philadelphia Grand Juries primarily conducted the investigation of defendants; that the Government selectively presented evidence to the Delaware Grand Jury which it had obtained from the Philadelphia Grand Juries; that the Government specifically excluded exculpatory material from its selective presentation; that the Indictment was based primarily upon hearsay evidence; and that the Delaware Grand Jury failed to conduct a meaningful independent investigation of defendants. Defendants assert that the foregoing claims can be resolved effectively only by allowing them comprehensive discovery of the Grand Jury proceedings.

 Defendants' baseless allegations are not sufficient to warrant disclosure under either the traditional particularized need test or the less stringent standard which will govern disclosure once the grand jury has dissolved. Grand Jury proceedings generally are accorded a presumption of regularity, *United States v. Winchester*, 407 F.Supp. 261, 277 (D.Del.1975), and mere suspicions of impropriety will not justify intrusion into the confidentiality of the proceedings. *E. g., United States v. Olin Corp.*, 465 F.Supp. 1120, 1134–35 (W.D.N.Y.1979); *United States v. McGrath*, 459 F.Supp. 1271, 1273 (S.D.N.Y.1978); *United States v. Winchester, supra*, 407 F.Supp. at 277–78; *United States v. Wolfson*, 294 F.Supp. 267, 271–72 (D.Del.1968); *see United States v. Budzanoski*, 462 F.2d 443, 454 (C.A.3), *cert. denied*, 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972). Requests for inspection of grand jury matters must be bottomed on more than the mere belief that improper conduct has occurred and that discovery will verify this belief. *United States v. Wolfson, supra*, 294 F.Supp. at 272.

In a strikingly similar case, Judge Schwartz rejected a request for grand jury records based on analogous, speculative allegations of grand jury abuse. In *United States v. Winchester, supra*, the defendant raised questions about the grand jury's ability to return a superseding indictment within 33 days of the original indictment, arguing that the grand jury process must have been in some way short-circuited to enable such a voluminous indictment to be returned in such a short time. 407 F.Supp. at 277. The defendant asserted that disclosure of the prosecutor's instructions to the grand jury was necessary to determine whether the grand jurors actually read the indictment or whether they improperly voted the indictment on the basis of the prosecutor's summary and description of its contents. In denying defendant's disclosure request, Judge Schwartz observed that when an indictment appears regular on its face, unsupported conjecture concerning possible improprieties is insufficiently particularized to warrant inquiry into the underlying grand jury proceeding. *Id.* at 277–78.

Like the defendant in *Winchester*, defendants' efforts to obtain information concerning the Indictment represent a fishing expedition designed to uncover defects when none are known to exist. *See United States v. Bally Manufacturing Corp.*, 345 F.Supp. 410, 421 (E.D.La.1972). To accept defendants' wholly unfounded charges as an adequate basis for disclosure would eliminate any constraints on the discovery of confidential grand jury materials and would render the secrecy requirement obsolete. Although there is support in some quarters for just such a result, it is the prerogative of the Congress to effectuate such a fundamental alteration in the character of grand jury procedure, and this Court will not preside over any judicial modifications of that magnitude. Accordingly, defendants' motion for discovery of grand jury matters is denied.[57]

---

57. *United States v. Mahoney, supra*, cited by defendants in support of their argument does

not compel a contrary result. Unlike defendants' motion for discovery, the motion in that

## B. Attendance Records

Defendants further seek production of the Delaware Grand Jury attendance records.[58] Defendants argue that Rule 6(b), F.R.Cr.P., requires that 12 or more "informed" grand jurors vote to return an indictment and that a grand juror is "informed" only if he attends every session at which evidence is presented on the proposed indictment. Because defendants have unspecified grounds for believing that 12 or more informed grand jurors did not vote to return the instant Indictment, they argue that discovery of the attendance records must be allowed.

The propriety of disclosure of the attendance records is governed by Rule 6(e) and must be judged under the standards discussed in the preceding section. Consequently, this Court may permit disclosure only "upon a showing that grounds may exist for a motion to dismiss the Indictment." F.R.Cr.P. 6(e). The Court finds that even if less than 12 of the grand jurors which returned the Indictment attended every session at which evidence was presented, this would not constitute grounds for dismissing the Indictment. Therefore, defendants' request is without legal basis and will be denied.

The operations of the grand jury are subject to very few procedural constraints. Rule 6, F.R.Cr.P., which implements the Fifth Amendment right to indictment, provides that a "grand jury consist of not less than 16 nor more than 23 members," and that "an indictment may be found only upon the concurrence of 12 or more jurors."

F.R.Cr.P. 6(a), (f). The Rule, by its terms, does not require that a grand juror be present at all sessions in order to cast an informed vote to indict. See *United States v. Leverage Funding Systems, Inc.,* 637 F.2d 645 (C.A.9, 1980).

Those courts which have considered this issue have almost uniformly refused to engraft defendants' proposed attendance requirement onto Rule 6.[59] See *United States v. Leverage Funding Systems, Inc., supra; United States v. Colasurdo,* 453 F.2d 585 (C.A.2, 1971), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972); *United States ex rel. McCann v. Thompson,* 144 F.2d 604 (C.A.2), *cert. denied,* 323 U.S. 790, 65 S.Ct. 313, 89 L.Ed. 630 (1944); *United States v. Deerfield Speciality Papers, Inc.,* 501 F.Supp. 796 (E.D.Pa.1980); *United States v. Olin Corp.,* 465 F.Supp. 1120 (W.D. N.Y.1979); *United States v. Pastor,* 419 F.Supp. 1318 (S.D.N.Y.1975); *United States v. Anzelmo,* 319 F.Supp. 1106 (E.D.La.1970); *United States v. Armour & Co.,* 214 F.Supp. 123 (S.D.Cal.1963). The basis for this consensus of opinion is best summarized by Judge Learned Hand in the seminal case of *United States ex rel. McCann v. Thompson, supra :*

> Since all the evidence adduced before a grand jury—certainly when the accused does not appear—is aimed at proving guilt, the absence of some jurors during some part of the hearings will ordinarily merely weaken the prosecution's case. If what the absentees actually hear is enough to satisfy them, there would seem to be no reason why they should not vote.

---

case cited four specific examples of prosecutorial abuse, including actual evidence that the prosecutor had summarized for the grand jury the testimony of certain witnesses who had testified before a prior grand jury. 495 F.Supp. at 1273. The Court found that the claims were sufficient to warrant disclosure but acknowledged that "mere speculation" would not justify inspection and that "grand jury deliberation should not be opened solely for discovery purposes." *Id.*

**58.** D.I. 42, 50 at 17.

**59.** Approximately three district courts in the Ninth Circuit have held otherwise. See *United States v. Roberts,* 481 F.Supp. 1385 (C.D.Cal.

1980); *United States v. Leverage Funding Systems, Inc.,* 478 F.Supp. 799 (C.D.Cal.1979), *rev'd,* 637 F.2d 645 (C.A.9, 1980); *United States v. Brooklier,* 459 F.Supp. 476 (C.D.Cal.1980) (bench memorandum). Defendants chiefly rely on the decision in *United States v. Leverage Funding Systems, Inc., supra,* to support its disclosure argument. The Ninth Circuit recently reversed the district court holding and sided with the majority of courts in concluding that a perfect attendance rule was not mandated by Rule 6. See *United States v. Leverage Funding Systems, Inc.,* 637 F.2d 645 (C.A.9, 1980).

Against this we can think of nothing except the possibility that some of the evidence adduced by the prosecution might conceivably turn out to be favorable to the accused; and that, if the absentees had heard it, they might have refused to vote a true bill. No one can be entirely sure that this can never occur; but it appears to us so remote a chance that it should be left to those instances in which it can be made to appear that the evidence not heard was of that character, in spite of the extreme difficulty of ever proving what was the evidence before a grand jury. Indeed, the possibility that not all who vote will hear all the evidence, is a reasonable inference from the fact that sixteen is a quorum.

144 F.2d at 607.

■ The logic of this reasoning remains sound. A grand jury is not charged with determining the guilt or innocence of an accused, but is responsible solely for making an initial assessment of probable cause. *See United States v. Leverage Funding Systems, Inc., supra.* The *McCann* decision assumes that for this purpose, a grand juror can faithfully discharge his constitutional duty and nevertheless find a *prima facie* case on less than *all* the evidence presented. *United States v. Pastor, supra,* 419 F.Supp. at 1329. The Court can find no basis, either in reason or experience, for rejecting this assumption.

Moreover, the practical difficulties in imposing an attendance rule would be considerable. As noted by the Second Circuit in *United States v. Colasurdo, supra,* enforcement of such a rule would require "a preliminary trial" to determine "each juror's presence at the time when each item of evidence was introduced." 453 F.2d at 596. This would entail broad exposure of the government's case, and further "bog down the courts in a veritable jungle of speculation and conjecture." *Id.* The alternative to this "preliminary trial" would be to compel the attendance of all the grand jurors at

each and every session, thus creating an onerous and unjustified burden which would severely inhibit the grand jury's ability to perform its constitutional function.

Accordingly, the Court finds that neither the Fifth Amendment nor Rule 6(f) require that at least 12 jurors voting to indict a defendant attend every grand jury session at which evidence is presented. Since defendants' asserted grounds for disclosure of the attendance records are legally insufficient to disturb the secrecy surrounding the grand jury proceedings, defendants' request will be denied. *See United States v. Winchester,* 407 F.Supp. 261, 278 (D.Del.1975).

There are other independent grounds for denying defendants' discovery request. As the preceding section amply demonstrates, mere conjecture that irregularities have occurred will not justify an inquiry into the proceedings giving rise to an indictment. *See United States v. Olin Corp.,* 465 F.Supp. 1120, 1134–35 (W.D.N.Y.1979). No facts have been presented to the Court which would even create an inference that fewer than 12 grand jurors voting to indict defendants attended every grand jury session. Defendants have again presented nothing more than their "belief" to justify discovery. Accordingly, even if defendants' purported basis for discovery was legally sufficient, their failure to present even a scintilla of factual support for disclosure of the attendance records is further grounds for denying their request *in toto.*

## XI. *EUGENE BOFFA, SR.'S DISCOVERY MOTION*

Eugene Boffa, Sr., joined by all other defendants except Lemon, has also moved to compel disclosure of certain information purportedly in the Government's possession pursuant to Rule 16(a)(1), F.R.Cr.P., and the constitutional mandate of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[60] Defendants have requested disclosure of nine specific categories of in-

60. D.I. 63 and 64.

formation. The Court will first briefly discuss the principles which will govern its consideration of those requests and then will address the specific requests *seriatim.*

Rule 16(a)(1)(C), the subsection of Rule 16(a)(1) upon which defendants apparently rely,[61] and the *Brady* rule must be considered in tandem for the purposes of this motion.

The *Brady* rule, unlike Rule 16, is not a discovery rule but a rule of fairness and minimum prosecutorial obligation, *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977); *United States v. Kaplan,* 554 F.2d 577, 579 (C.A.3, 1977); *United States v. Thevis,* 84 F.R.D. 47, 51 (N.D.Ga.1979), and forbids "the suppression by the prosecution of evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment." *Brady v. Maryland, supra,* 373 U.S. at 87, 83 S.Ct. at 1196. Thus, under *Brady,* material and exculpatory evidence must be disclosed. Because *Brady* is mandated by constitutional principles of fairness, even in the absence of any request it compels the disclosure of any "*obviously exculpatory* . . . evidence in the hands of the prosecutor . . . if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce even in the absence of any request for disclosure or where only a

general request is made." (Emphasis added.) *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). A general non-specific request for *Brady* material or exculpatory material adds nothing to this duty and will require the disclosure of only *obviously* exculpatory and material evidence. However, if a request for relevant and specific information is received by a prosecutor, he must respond to that request as long as there is some substantial basis for claiming materiality. *Id.* at 106, 96 S.Ct. at 2398.

Insofar as it is relevant to the evidence sought by defendants here, the scope of disclosure mandated by Rule 16(a)(1)(C) differs from that mandated by *Brady* only in that under Rule 16, (1) there must always be a request for disclosure of specific materials, (2) non-exculpatory material evidence must be disclosed as well as exculpatory, and (3) there must always be a showing that a request is reasonable. *United States v. Kaplan, supra,* 554 F.2d at 579–80.

The common denominator of Rule 16(a)(1)(C) and *Brady* is that both require that evidence be "material" before they mandate disclosure. The standard of materiality is the same under Rule 16 and under *Brady.*[62] Material evidence is evidence that might affect the outcome of the trial. *United States v. Agurs, supra,* 427

---

**61.** Rule 16(a)(1)(C) provides:

(a) Disclosure of Evidence by the Government.

(1) Information Subject to Disclosure.

(C) Documents and Tangible Objects. Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of his defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

Subsection A, B, and D deal with statements made by defendants, defendants' prior records, and reports of examinations and tests, respectively.

**62.** The notes of the Advisory Committee on the Rules discussed the interplay between Rule 16(a)(1)(C) and *Brady* as follows:

Disclosure of documents and tangible objects which are "material" to the preparation of the defense may be required under the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), without an additional showing that the request is "reasonable." In *Brady* the court held that "due process" requires that the prosecution disclose evidence favorable to the accused. Although the Advisory Committee decided not to codify the *Brady* rule, the requirement that the government disclose documents and tangible objects "material to the preparation of his defense" underscores the importance of disclosure of evidence favorable to the defendant.

*See also United States v. Thevis, supra,* 84 F.R.D. at 51.

U.S. 104, 96 S.Ct. 2397; *DeMartino v. Weidenburner,* 616 F.2d 708 (C.A.3, 1980). Matters affecting the credibility of critical or major defense witnesses are considered material to the defense. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. McCrane,* 527 F.2d 906, 911 (C.A.3, 1975), *vacated,* 427 U.S. 909, 96 S.Ct. 3197, 49 L.Ed.2d 1202 (1976), *on remand* 547 F.2d 204 (C.A.3, 1976); *United States v. Five Persons,* 472 F.Supp. 64, 67 (D.N.J.1979).

■ Finally, although *Brady* material need not be disclosed before trial, courts have compelled pretrial production. *See United States v. Five Persons,* 472 F.Supp. 64 (D.N.J.1979). Moreover, the Third Circuit has adopted a policy encouraging the timely production of materials under both *Brady* and Rule 16. *United States v. Kaplan, supra,* 554 F.2d at 581; *Virgin Islands v. Ruiz,* 495 F.2d 1175, 1179 (C.A.3, 1974); *see also United States v. Deerfield Specialty Papers, Inc.,* 501 F.Supp. 796, at 818–819 (E.D.Pa.1980).

With these general principles in mind, the Court now turns to defendants' specific requests.

1. Any and all records and information revealing prior felony convictions or guilty verdicts or juvenile adjudications attributed to each witness called by the plaintiff including but not limited to relevant "rap sheets."

■ In response to this request, the Government attests that it does not have the material sought.[63] The Court accepts this attestation as true and, consequently, declines to grant the motion, since granting it would serve no purpose. In so doing, however, the Court notes the possibility that the prosecution could needlessly imperil its own case by not carefully considering the significance of its response. The Court

has not seen the Government's files, nor does it intend to speculate as to their contents, but the representation in answer to this motion does not seem immediately plausible.

2. Any and all records and information revealing prior misconduct or bad acts attributed to the witness.

■ The Government responds that it will bring this information out on direct.[64] In accordance with the terms of Rule 16(a)(1)(C) and the policy of the Third Circuit encouraging timely disclosure of *Brady* material, however, the Court will order that the information be furnished at or before December 31, 1980.

3. Any and all consideration or promises of consideration given to or on behalf of the witness or expected or hoped for by the witness. . . .

4. Any and all threats, express or implied, direct or indirect, or other coercion made or directed against the witness, criminal prosecutions, investigations, or potential prosecutions pending or which could be brought against the witness, any probationary, parole, deferred prosecution or custodial status of the witness, and any civil, tax court, court of claims, administrative, or other pending or potential legal disputes or transactions with plaintiff or over which plaintiff has real, apparent or perceived influence.

■ The Government explicitly recognizes the right of the defendants to the material requested in 3 and implicitly recognizes a right to that requested in 4. It says that it will disclose some of this information prior to direct and some "in advance of trial."[65] Again, the Court will order that it disclose the information on or before December 31, 1980.

**63.** D.I. 96, p. 57.

**64.** *Id.*

**65.** *Id.*

5. The existence and identification of each occasion on which the witness has testified before any court, grand jury, or other tribunal or body or otherwise officially narrated in relation to the defendants, the investigation, or the facts of this case.

6. The existence and identification of each occasion on which each witness who was or is an informer, accomplice, co-conspirator, or expert has testified before any court, grand jury, or other tribunal or body.

7. Any and all personnel files for the witness, the existence and identity of all federal, state and local government files for the witness and the existence and identity of all official internal affairs, internal investigation or public integrity investigation files relating to or connected with each witness who was or is a law enforcement officer.

These motions do not request matters that are material to the preparation of the defense as required by *Brady* and *Agurs* as well as Rule 16(a)(1)(C). *See United States v. Buckley*, 586 F.2d 498 (C.A.5, 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 242 (1979); F.R.Cr.P. 16(a)(1)(C). For this reason the request will be denied. The Government has stated that it recognizes its obligations under Section 3500 of Title 18 of the United States Code. Needless to say, if this type of information contains clearly exculpatory information, it must be disclosed regardless of whether a request has been made.

8. Any and all other records and/or information which arguably could be helpful or useful to the defense in impeaching or otherwise detracting from the probative force of the plaintiff's evidence or which arguably could lead to such records of information.

▆ This is merely a general request for exculpatory evidence and consequently requests no more than is already constitutionally required under *Brady* and *Agurs*. To enter an order requiring the requested disclosure could add little to the burden of disclosure that always rests on the prosecution, beyond setting a deadline for producing the material. It would be unduly burdensome to the prosecution to require it to search its files for exculpatory material within a short period of time, without any guidance in the form of a specific request from the defense. Consequently, this request will be denied.

9. The same records and information requested in items 1 through 8 above with respect to each non-witness declarant whose statements are offered in evidence.

▆ This request is too broad to be enforceable. Its connection to any specific request is so attenuated that it, like request 8, can impose no duty on the Government beyond that which it has in the absence of any request. Consequently, this request will also be denied.

## XII. *KALMAR'S DISCOVERY MOTION*

▆ Defendant Kalmar, joined by the other defendants except Lemon, also moves to discover certain material under the *Brady* doctrine, and Federal Rules of Criminal Procedure 12(d)(2) and 16.[66] *Brady* as explicated in *Agurs* does not mandate discovery here. As noted with reference to defendant Boffa's motion, *supra*, there is some overlap between the *Brady* doctrine and Rule 16. Unlike Boffa, however, whose motion seeks impeachment information, Kalmar does not present a motion that by its terms clearly seeks evidence material to the defense. Because materiality is a minimum requirement for evidence sought as exculpatory under *Brady*, the motion of defendant Kalmar does not qualify for treatment as a *Brady* request. In so ruling, the Court does not relieve the prosecution of the burden of disclosing exculpatory evidence. Rather, the Court finds that it

**66.** D.I. 53.

would be inappropriate to consider ordering pretrial compliance on the basis of *Brady*, given the wide ranging nature of the requests and the failure of defendants to differentiate their *Brady* from Rule 16 claims. *See United States v. Deerfield Speciality Paper, Inc., et al.*, 501 F.Supp. 796, at 818–819 (E.D.Pa.1980).

■ Rule 12(d)(2) is not, in itself, a basis for discovery either. To the contrary it only permits the defendant to "request notice of the government's intention to use (in its evidence in chief at trial) any evidence which the defendant may be entitled to discover under Rule 16 subject to any relevant limitations in Rule 16," in order to afford the defendant the opportunity to bring a pre-trial motion to suppress evidence. F.R.Cr.P. 12(d)(2). Consequently, this motion is governed solely by Rule 16, controlling discovery and inspection of evidence.

The Court will discuss the requests in the order employed by the defendants, breaking them down as necessary to clarify the basis of its rulings.

*Sources of Certain Evidence* : Disclosure of the date, nature and circumstances of the acquisition of any evidence intended to be used in this prosecution deriving, directly or indirectly, from any search and seizure, identification procedure, electronic surveillance, "bumper beeper," or other form of physical surveillance, interrogation, mail cover, and use of any form of civil investigative demand (including IRS summons, Department of Labor Subpoena).

■ The Government represents that it will use no evidence obtained as a result of search and seizure, identification procedure, or electronic surveillance. It further represents that it has already provided any evidence obtained as a result of electronic surveillance or "bumper beeper" that it intends to introduce at trial. (D.I. 98, p. 67.) The Court accepts these representations as true, and, therefore, will deny the requests of the defendants for such materials.

■ The defendants have advanced no grounds for ordering the disclosure of evidence obtained as a result of general physical surveillance, mail cover, or civil investigative demand, and the Court discerns none. For this reason the request for this information will also be denied. The Court addresses the request for evidence obtained through interrogation below, in its discussion of the request for statements made to third parties by the defendants.

*Third Party Documents and Other Tangible Items Acquired by Government* : Disclosure and inspection of all third party documents and other tangible objects acquired by the Government during the investigation of this case including, but not limited to, documents obtained from third parties by grand jury subpoena.

. . . *Identity of Persons Present at Events Alleged in Indictment* : Disclosure of the names and addresses of all persons reasonably believed by the Government to have been present (either to see or hear) at any of the events alleged in the indictment.

. . . *Identity of Non-Governmental Witnesses With Knowledge of Events Alleged in Indictment* : Disclosure of the names and addresses of all persons reasonably believed by the Government to have relevant knowledge, or who purport to have such knowledge, of the events alleged in the indictment, whom the Government does not intend to call as witnesses during its case-in-chief.

■ There is no statutory basis for granting such broad requests. They far exceed the parameters of Rule 16(a)(1)(C), which allows discovery of documents and objects that are material to the preparation of the defense or are intended for use by the prosecution. The requests, therefore, will be denied. The prosecution, of course, always has the duty of disclosing exculpatory evidence under *Brady* and *Agurs*.

*Discovery, Material to the Preparation of the Defense to Racketeering Acts 37–43 and 51* : Disclosure of the following material evidence to these racketeering acts: Disclosure of documents, reports of inter-

views or other evidence dealing with the manner in which the Government ascertained the "prevailing market price" of the 1975 Lincoln Continental as of September 15, 1976.

█ This request is for information both material to the preparation of the defense and, presumably, intended for use by the prosecution. It is, therefore, discoverable under Rule 16(a)(1)(C) and the Government will be required to disclose this information on or before December 31, 1980.

*Exculpatory Material on Racketeering Acts 37–43 and 51*: Disclosure of whether the Government has any information tending to show the existence of the following evidence and, if so, the nature of such information or, if in the possession of the Government, the disclosure of the evidence itself:

 a. *Payments by Sheeran....*

 b. *Lack of Knowledge of Kalmar....*

 c. *No Intent to Influence Sheeran ....*

The Court accepts the attestation of the Government that it does not possess this information (D.I. 98, p. 68), and, therefore, will not grant the request.

*Grand Jury Testimony of Any Person Deemed to be Employed by or Associated With the "Enterprise"*: Disclosure and copy of the grand jury testimony of any person deemed to be associated with or employed by the "enterprise" alleged in the indictment, to the extent that such person was at the time of the offense, personally involved in the alleged conduct constituting the offense and so situated as to have been able to legally bind the remaining members of the "enterprise" in respect to that alleged conduct in which such person was involved.

█ Rule 16(a)(3) specifically excludes grand jury proceedings from discovery. Rule 16(a)(1)(A) contains a limited exception to this exclusion, applicable only when the defendant is a corporation, partnership, association, or labor union, and the witness whose testimony is sought "was, at the time of the offense, personally involved in the alleged conduct constituting the offense

and so situated as an officer or employer as to have been able legally to bind the defendant in respect to that alleged conduct in which he was involved." F.R.Cr.P. 16(a)(1)(A). The defendants urge the Court to grant their request by analogy to this provision, which by its terms is clearly inapplicable. The Court will not extend this exception beyond the manifest intent of Congress in adopting it. The analogy is, at best, incomplete. The legal entities named in the exception can act only through their agents. For this reason, it is appropriate to require disclosure of the grand jury testimony of such agents as statements of the defendant. When the defendant is an individual this logic is inapplicable.

*Defendant's "Statements" Made to Third Parties*: Disclosure, inspection and copying of all relevant statements and declarations made by the defendant, whether oral, written or recorded, whether before or after arrest, and regardless of whether intended by the Government for use as substantive evidence, impeachment evidence, or otherwise.... (D.I. 53, ¶ 9.)

█ In response to this request the Government represents that the "[d]efendants have already received the statements to which they are entitled." (D.I. 96, p. 68.) The Court is unable to determine on the basis of this statement as to what the Government has provided the defendants with respect to this request. Therefore, in accordance with Rule 16(a)(1)(A) the Court will order the Government to provide the defendants with: (1) any "relevant written or recorded statements" of the defendants within its possession; (2) the substance of any oral statement, made by the defendants and intended for use as evidence by the prosecution, which was made in response to interrogation at any time "by any person then known to the defendant to be a government agent"; and (3) any recorded grand jury testimony of the defendants relating to the offenses charged. The Government will be required to produce this material at least on or before December 31, 1980.

**504**

*Witness List*: A list of names and addresses of witnesses whom the Government intends to call in its case-in-chief.

██ The defendants are not entitled to a witness list and the Court will not order that one be provided. *See e. g., United States v. Sclamo*, 578 F.2d 888, 890 n.1 (C.A.1, 1978).

*Sham Defendants and Co-conspirators*: Disclosure, by written statement filed of record, as to whether any of Kalmar's co-defendants or alleged co-conspirators, whether indicted or not, are sham defendants and co-conspirators or are otherwise informants for the Government at the time of the offense or at the time of the trial, within the meaning of *United States v. Rispo.*

██ In *United States v. Rispo*, 460 F.2d 965 (C.A.3, 1972), criminal defendants were tried jointly with a coindictee who was a government informer before and during trial and whose attorney conferred with attorneys for the other defendants, not knowing for a time that his client was a government agent. The Court of Appeals for the Third Circuit reversed the convictions, finding that the government had abridged the right of the defendants to due process by denying them a fair trial. *Rispo* does not require the prosecution to disclose the existence of informants prior to the indictment. For these reasons the Court will deny this request.

*Brady and Jencks Act Responsibility*: Disclosure of the identity of the specific Department of Justice attorney who shall assume responsibility for diligently searching for, maintaining and disclosing *Brady* and *Jencks* materials in this case.

██ The Government responds that no one attorney has this responsibility. (D.I. 96, p. 68.) The request will, therefore, be denied.

## XIII. *MISCELLANEOUS MOTIONS*

██ The defendants, although indicted by a grand jury, have moved to dismiss the

**67.** D.I. 71.

Indictment or in the alternative to grant a preliminary hearing.[67] There is no merit whatsoever to this motion. Once an indictment has been returned a preliminary hearing is not required. *United States v. Farries*, 459 F.2d 1057, 1061–62 (C.A.3), *cert. denied*, 409 U.S. 888, 93 S.Ct. 143, 34 L.Ed.2d 145 (1972), 410 U.S. 912, 93 S.Ct. 975, 35 L.Ed.2d 275 (1973); *United States v. Conway*, 415 F.2d 158, 160–61 (C.A.3, 1969), *cert. denied*, 397 U.S. 994, 90 S.Ct. 1131, 25 L.Ed.2d 401 (1970); *Rivera v. Government of the Virgin Islands*, 375 F.2d 988 (C.A.3, 1967); 18 U.S.C. § 3060(e).

██ The defendants have also moved to dismiss the Indictment on the ground that it was returned after an unjustifiably long and prejudicial period of pre-indictment delay in violation of the Fifth Amendment and Rule 48(b), F.R.Cr.P.[68] The proscriptive provisions of Rule 48(b) are limited to situations where there is an unnecessary delay in presenting the charge to the grand jury *after* the defendant has been arrested. *United States v. Marion*, 404 U.S. 307, 319, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971). Clearly, the rule is inapplicable to this case. The Supreme Court has stated, however, that claims of pre-indictment delay may be brought under the Due Process Clause of the Fifth Amendment and dismissal of the indictment is required if the delay caused substantial prejudice to the defendants' rights to a fair trial or the delay was an intentional device by the prosecutor to gain a tactical advantage over the accused. *Id.* at 324, 92 S.Ct. at 465; *United States v. Dukow*, 453 F.2d 1328, 1330 (C.A.3, 1972); *United States v. Clark*, 398 F.Supp. 341, 350 (E.D.Pa.1975). Defendants have not presented any factual basis upon which the Court can conclude that the purported pre-indictment delay was either substantially prejudicial or a contrived tactic of the prosecutor. Accordingly, defendants' motion will be denied.

██ The defendants have moved that the Government retain any rough interview

**68.** D.I. 61, ¶ 13.

notes of prospective witnesses since they may contain *Brady* material even if the notes are not discoverable under the Jencks Act, 18 U.S.C. § 3500.[69] The Government has responded that it is aware of its responsibility to retain rough notes.[70] No order on this motion is thus required and the motion will be denied.

The defendants have moved for an order under 18 U.S.C. § 3504 requiring government counsel to affirm or deny the existence of any electronic surveillance.[71] The Government has complied with the request contained in this motion [72] and therefore it will be denied as moot.

---

**69.** D.I. 69 & 70.

**70.** D.I. 96, p. 63.

**71.** D.I. 67.

**72.** D.I. 98, 99, 100 & 101.